IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

GREGORY PATMYTHES,

    Plaintiff,

                                   Case No. 16-cv-738

CITY OF MADISON,

    Defendant.

---

**AFFIDAVIT GREGORY PATMYTHES**

---

STATE OF WISCONSIN )
                   ) SS
COUNTY OF DANE     )

Gregory Patmythes, being first duly sworn on oath, deposes and states as follows:

Jurisdiction and Venue

1. Jurisdiction over plaintiff's claims is conferred upon this court pursuant to 28 U.S.C.A. §§1331 and 1343.

2. Venue in the United States District Court for the Western District of Wisconsin is appropriate under 28 U.S.C. §1391(b).

<u>Parties</u>

3. The plaintiff, Gregory Patmythes, is an adult citizen, residing at 3614 Stonebridge Dr., City of Madison, Dane County, Wisconsin 53719.

4. The defendant, the City of Madison, is a Wisconsin governmental entity, governing in Dane County, Wisconsin, whose principal city office is at 210 Martin Luther King Jr. Blvd., Madison, Wisconsin 53703.

5. Relief is sought against defendant as well as its agents, assistants, successors, employees, and all persons acting in concert or cooperation with it or at its direction.

<u>Western District of Wisconsin – Judge William Conley</u>

6. This court published has a handout titled "Helpful Tips For Filing A Summary Judgment Motion In Cases Assigned to Judge William Conley." A true and accurate copy of page 7 is attached. Exh. 1.

7. The section on Evidence states that documents need to be referenced by exhibit number, page and paragraph. A true and accurate copy is attached. Exh. 1. p 1 ¶ C.1.f.

8. The Defendant's references to exhibits lack the required page and paragraph citation information.

9. Plaintiff has disputed the issues that have yet to ripen for this court in Plaintiffs Response to Findings of Fact.

<u>Introduction</u>

10. Genetic privilege. "Genetic privilege" includes the terms, conditions, privileges or rights of employment established are those of "genetic privilege", similar to "white privilege", is a term for societal privileges that benefit "genetically privileged" people in western countries beyond what is commonly experienced by genetically defective people or people with genetic diseases ("bad genes") under the same social, political, or economic circumstances.

Disabilities:

11. The record of Plaintiff's disability while employed by the city of Madison dates to the fall of 2004.

12. This court in case 04-C-0367C has recognized Plaintiff suffers from cystic fibrosis.

13. The Seventh Circuit Court of Appeals has recognized I suffer from cystic fibrosis, case number 05-3074.

14. Cystic fibrosis, a genetic disease, substantially limits a number of major life activities, including, but not limited to, caring for oneself, performing manual tasks, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

15. Cystic fibrosis, a genetic disease, substantially limits a number of major bodily including but not limited to functions of the immune system, normal cell growth, digestive, bowel, bladder, respiratory, circulatory, endocrine, and reproductive functions.

16. Cystic fibrosis is a genetic defect, in other words I have "bad genes."

17. Plaintiff does his best to manage his diseases and be independent.

18. At some point Plaintiff will become dependent on others to care for him and fears becoming a burden or pain in the ass.

19. Anxiety and depression have substantially limited major life activities, including but not limited to sleeping, learning, concentrating, thinking, working, and caring for my cystic fibrosis.

20. Plaintiff suffers from cystic fibrosis, anxiety, and depression.

21. Since this action was filed Plaintiff was hospitalized for and has been diagnosed with a severe autoimmune condition, a type of arthritis found in patients with cystic fibrosis.

22. Arthritis has substantially limited Plaintiff's major life activities, which include sleeping, learning, concentrating, thinking, working, bathing, dressing, walking and caring for my cystic fibrosis.

23. Plaintiff is disabled by definition and has serious medical conditions.

24. The median predicted age of survival is 39.3 (2014 data) years for an American cystic fibrosis patient. A true and accurate copy of the information is attached. Exh. 2. p 1 ¶2

25. The Bureau of the Census lists an average life expectancy of 75.9 years American.

26. The life expectancy of a cystic fibrosis patient being, approximately fifty percent shorter than the average American.

27. Wage insurance payments and Social Security Disability Insurance (SSDI) payments are based on earnings.

<u>Federal Laws:</u>

28. Cystic fibrosis, depression, and anxiety meet the definition of a serious health condition as defined by Family and Medical Leave Act (FMLA) of 1993, 29 U.S.C. §§ 2601–2654.

29. Cystic fibrosis, depression, and anxiety meet the definition of a disability as defined by Americans With Disabilities Act of 1990 (ADA), Pub. L. No. 101-336, § 1, 104 Stat. 328 (1990).

30. Cystic fibrosis, depression, and anxiety meet the definition of a disability as defined by Americans With Disabilities Amendments Act of 2008.

31. Cystic fibrosis, depression, and anxiety meet the definition of a disability in the Rehabilitation Act of 1973, as amended in 1992 and 1998.

32. The Americans With Disabilities Act of 1990, Americans With Disabilities Amendments Act of 2008, and the Rehabilitation Act of 1973, as amended in 1992 and 1998 are different pieces of legislation.

33. Compliance with the Rehabilitation Act may be different than compliance with The Americans With Disabilities Act of 1990 or Americans With Disabilities Amendments Act of 2008.

34. Because the ADA was influenced by the earlier Rehabilitation Act in several important ways.

35. First, Congress was convinced that the Rehabilitation Act alone was not sufficient to end the widespread discrimination against people with disabilities that exists in this country.

36. Secondly, where courts interpreted the Section 504 antidiscrimination provisions very narrowly, Congress clarified their intention to provide broader protections in the ADA.

37. Finally, much of the ADA is based on Section 504 of the Rehabilitation Act and its regulations.

38. In turn, the ADA influenced the Rehabilitation Act during its reauthorization in 1992.

39. In 1992 the Rehabilitation Act was amended to reflect the language, goals and objectives of the ADA.

40. The Rehabilitation Act adopted the ADA's emphasis on integration as its own and translated the principles and policies of the ADA into government rehabilitation programs for people with disabilities.

41. The integration of people with disabilities into the mainstream of society is also fundamental to both laws.

42. Section 504 is a civil rights act which protects the civil rights of persons with disabilities by prohibiting discrimination on the bases of disability by the federal government, federal contractors, and by recipients of federal financial assistance.

43. Organizations that receive federal funds are required to make their programs accessible to individuals with disabilities. Although its protections are limited in that they only apply to programs or businesses that receive federal funds, it was an important model for the ADA.

44. Title II of the ADA applies the same requirements to state and local government entities.

45. The biggest difference is that Section 504 applies to federally funded programs and that the ADA applies to state and local government funded programs (Title II).

46. Between the two laws, all government funded programs are covered. Of course, there are many programs, such as school districts which receive federal, state and local funds, and are therefore are covered by both laws at the same time.

47. The Rehabilitation Act as amended prohibits discrimination in employment in these relevant areas: Section 503 requires contractors who have contracts with the federal government for $10,000 or more annually to take affirmative action to employ and to advance in employment qualified individuals with disabilities. Section 504 prohibits recipients of federal financial assistance from discriminating against qualified individuals with disabilities in employment as well as in their other programs and activities.

48. The due process and equal protection clauses of the Fifth and Fourteenth Amendments also apply to this matter.

49. Title VII of the Civil Rights Act of 1964.

50. Restatement of Contracts of 1932 (RESTATEMENT) Section 90 Promise Reasonably Inducing Action or Forbearance.

51. Second Restatement of Contracts of 1981 (SECOND) Section 90 Promise Reasonably Inducing Action or Forbearance.

The Legislative Branch & Intent:

52. Congress intended for the ADA to function differently than the Rehabilitation Act because every word of a statute is presumed to have some meaning. See United States v. Menasche, 348 U.S. 528, 538–39 (1955) (asserting that courts must "give effect, if possible, to every clause and word of a statute"); Mkt. Co. v. Hoffman, 101 U.S. 112, 115,(1879) (declaring that every aspect of a statute must be construed in a way that gives each part of the statute meaning). "significant difficulty or expense." See 42 U.S.C. § 12111(10) (defining undue hardship). United Airlines, 693 F.3d at 764–65 (holding that disabled employees are entitled to noncompetitive reassignments as a reasonable accommodation), Midland Brake, 180 F.3d at 1166–67 (same), and Aka, 156 F.3d at 1304–05 (same).

53. Forcing disabled employees to compete with nondisabled employees for vacant positions renders the Act's reassignment clause meaningless. The ADA's text, legislative history, and the EEOC enforcement guidance implementing the ADA all indicate that disabled employees are entitled to automatic reassignments instead of the mere opportunity to compete for reassignments.

54. "By contrast, under the ADA, reasonable accommodations must be provided unless they rise to the level of 'requiring significant difficulty or expense' on the part of the employer, in light of the factors noted in the statute — i.e., a significantly higher standard than that articulation in Hardison." H.R. REP. NO. 101-485, pt. 2, at 68 (1990).

55. According to the ADA, an undue hardship is an "action requiring significant difficulty or expense" when considered in light of several factors. 42 U.S.C. § 12111(10)(A).

56. These factors include, but are not limited to, the nature and cost of the accommodation, the resources of the facility providing the accommodation, the resources of the disabled employee's employer, and the type of operations of the employer. § 12111(10)(B)(i)–(iv).

57. Defendant has never articulated an undue hardship to Plaintiff's requests.

Economic Opportunities:

58. In addition to textual support, the ADA's legislative history also encourages promoting the economic opportunities of disabled persons through preferential treatment in the reassignment process. Aka, 156 F.3d at 1304 (using the ADA's legislative history to reason that the Act provides preferential treatment to disabled employees through reasonable accommodations To accomplish this goal, according to the legislative history, the ADA requires employers to do more to accommodate disabled employees than Title VII requires employers to do to accommodate the religious beliefs of employees. See H.R. REP. NO. 101-485(II), at 68, 1990 U.S.C.C.A.N. 303, 350.

The Judicial Branch Speaks:

59. For one thing, in ordinary English the word "reasonable" does not mean "effective." It is the word "accommodation," not the word "reasonable," that conveys the need for effectiveness. An ineffective "modification" or

"adjustment" will not accommodate a disabled individual's limitations. US Airways, Inc. v. Barnett, 535 U. S. 391 (2002).

60. As a general rule, however, the Court stated that an accommodation for a disabled employee is not automatically unreasonable solely because it allows the disabled employee to violate an employer-established rule that nondisabled employees must follow. See Shapiro v. Twp. of Lakewood, 292 F.3d 356, 361 (3d Cir. 2002) (applying this general rule).

61. The Court adopted a multi-step analysis to determine if a particular accommodation would qualify as reasonable under the ADA. See id. at 401–02, 405; Shapiro, 292 F.3d at 361;

62. See also 42 U.S.C. § 12112(b)(5)(A) (2012) (providing the reasonable accommodation requirement). In fashioning this new method of analysis, the Court noted that its approach aligned with the practice of lower courts. See U.S. Airways, 535 U.S. at 401–02.

63. Step 1: First, an employee can demonstrate that an accommodation "seems reasonable on its face, i.e., ordinarily or in the run of cases." U.S. Airways, 535 U.S. at 401–02; see Shapiro, 292 F.3d at 360–61. For an accommodation to be reasonable on its face or in the run of cases it only needs to be feasible or plausible. U.S. Airways, 535 U.S. at 401–02. For example, if the essential functions of a hearing-impaired employee's position required her to contact the public by telephone, installing a teletypewriter ("TTY") would be reasonable on its face because installation is both feasible and plausible. If the employee is able to show

that the accommodation is reasonable through this first method, the burden then

shifts to the employer to prove that the accommodation would be an undue

hardship. U.S. Airways, 535 U.S. at 402; Shapiro, 292 F.3d at 361;

42 U.S.C. § 12112(b)(5)(A) (establishing the undue hardship affirmative

defense). According to the Court, determining if an accommodation is an

undue hardship is a case-specific inquiry that focuses on how the

accommodation will adversely affect the employer. U.S. Airways, 535 U.S. at

402; see also Barth v. Gelb, 2 F.3d 1180, 1187 (D.C. Cir. 1993) (stating that an

undue hardship analysis examines the hardships created by the plaintiff's

requested accommodation with an eye to the employer's unique situation).

64. Second, an employee also has the option of demonstrating that an

accommodation is reasonable "on the particular facts." U.S. Airways, 535 U.S. at

405; Shapiro, 292 F.3d at 361.

65. If an employee is successful under this second method, it is difficult for the

employer to raise an affirmative defense of undue hardship because most

accommodations are not simultaneously reasonable on the particular facts and

unduly burdensome. See Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 138

(2d Cir. 1995) (noting that describing an accommodation as unreasonable or an

undue hardship can "merge" into the same argument); Hall v. U.S. Postal Serv.,

857 F.2d 1073, 1080 (6th Cir. 1988) (indicating that an unreasonable

accommodation is identical to an accommodation imposing an undue

hardship). See generally Mark C. Weber, Unreasonable Accommodation and

Due Hardship, 62 FLA. L. REV. 1119 (2010) (arguing that reasonable accommodation and undue hardship are "two sides of the same coin").

Non-competitive Reassignment

66. In 2012 the U.S. Court of Appeals for the Seventh Circuit held that U.S. Airways supports noncompetitive reassignments, thereby abrogating the Mays decision. United Airlines, 693 F.3d at 764 (stating that the Mays court <u>incorrectly determined that violating best-qualified reassignment policies always constitutes an undue hardship</u>).

67. In these jurisdictions, disabled employees are entitled to <u>automatic reassignment to vacant positions</u> without competing against qualified nondisabled candidates. See United Airlines, 693 F.3d at 764–65; Midland Brake, 180 F.3d at 1166; Aka 156 F.3d at 1305.

68. The courts reason that disabled employees are entitled to more than an opportunity to compete for reassignments because holding otherwise would render the ADA's reassignment clause meaningless. See Midland Brake, 180 F.3d at 1167 (stating that the ADA's promise of reasonable accommodation is "empty" if an employer is only required to consider a disabled employee's application for reassignment); Aka, 156 F.3d at 1304 (noting that other sections of the ADA already require employers to allow disabled employees to compete for reassignments); see also Dorsey, at 460–62 (discussing textualist arguments made by courts in favor of mandatory reassignments).

69. Plaintiff has been denied reassignment to vacant positions, that he was qualified for.

Preference Proves Necessary

70. In 2012, EEOC v. United Airlines, Inc., the Seventh Circuit departed from precedent and held that disabled employees are entitled to noncompetitive reassignments as a reasonable accommodation. 693 F.3d at 764–65. The Seventh Circuit stated that its previous decision in Mays misinterpreted U.S. Airways and that the U.S. Supreme Court decision actually provided support for noncompetitive reassignments. Stating that the Mays court mistakenly concluded that a best-qualified selection policy is the equivalent of a seniority system and will therefore be unreasonable in the run of cases).

71. As the United Airlines court emphasized, the U.S. Supreme Court stated that the ADA sometimes requires employers to provide disabled employees with preferential treatment. (quoting U.S. Airways, 535 U.S. at 397) (determining that "preferences will sometimes prove necessary to achieve the Act's basic equal opportunity goal").

72. The fact that a reassignment allows a disabled employee to break a rule that other nondisabled employees must follow does not per se make the reassignment unreasonable or an undue hardship. (stating that the U.S. Airways analysis must be used to determine if noncompetitive reassignment would be either reasonable or an undue hardship).

73. Indeed, it would be disingenuous to claim that employees who take the initiative and successfully obtain vacant positions through competitive processes have been "reassigned." See Midland Brake, 180 F.3d at 1164 (asserting that the word "reassignment" suggests some active effort from the employer and that a narrower definition of reassignment would do "violence to the literal meaning of the word"); Aka, 156 F.3d at 1304 (indicating that the core word "assign" implies some active effort from the employer).

Multiple Disabilities Are A Special Circumstance

74. In Barnett the court allowed for a showing of "special circumstances." 535 U.S. 391 (2002).

75. Plaintiff has multiple disabilities and serious medical conditions (cystic fibrosis, anxiety, and depression) to be accommodated.

76. Defendant refuses to acknowledge that effective modifications or effective adjustments for multiple disabilities meet the threshold of "special circumstances."

State Laws:

77. The State of Wisconsin has a statute for Family and Medical Leave (WIFLMA) §§103.10.

78. Cystic fibrosis meets the definition of a serious health condition as defined by the State of Wisconsin statute for Family and Medical Leave.

79. §§103.10.(11) lists prohibited acts, including "No person may interfere with, restrain or deny the exercise of any right provided under this section."

80. The State of Wisconsin has a Fair Employment Act (WFEA), §§111.31.

81. §§111.31(3) In the interpretation and application of this subchapter, and otherwise, it is declared to be the public policy of the state to encourage and foster to the fullest extent practicable...regardless of ... disability,... This subchapter shall be liberally construed for the accomplishment of this purpose.

82. §§111.31(3) Discriminatory actions prohibited. Subject to §§ 111.33 to 111.365, it is an act of employment discrimination to do any of the following:

    (1) ...to discriminate against any individual in promotion, compensation or in terms, conditions or privileges of employment or labor organization membership because of any basis enumerated in s. 111.321.

83. The State of Wisconsin Fair Employment Act (WFEA) prohibits discrimination based on protected classes, including disabilities.

84.  Cystic fibrosis meets the definition of a disability as defined by the State of Wisconsin Fair Employment Act.

Local Laws:

85. The city of Madison has Madison General Ordinance (MGO) Chapter 39, which contains an Affirmative Action Ordinance (MGO 39.02), an Equal Opportunity Ordinance (MGO 39.03) and an ordinance to prohibit discrimination on the basis of disability in city facilities and city-assisted programs and activities (MGO 39.05).

86. MGO Chapter 39 protects more than twenty (20) classes, including disabilities, gender, and race.

87. MGO 39.05 is used to "impose upon City facilities and upon recipients of City financial assistance, nondiscrimination requirements which are the same as, and consistent with, the nondiscrimination requirements which are imposed upon recipients of federal funding by the Rehabilitation Act of 1973, as amended."

88. MGO Chapter 39 ignores the ADA.

Madison, a municipality and an employer

89. The Mayor is elected to lead the municipal government and serves as the chief executive officer of the City of Madison.

90. The two entities, city of Madison and City of Madison, are indistinguishable for the purposes of this action.

91. Defendant is a member of the Government Alliance on Race and Equity (GARE).

92. GARE "leads with race", in other words provides advantages in the hiring process based on race.

93. Title VII of the Civil Rights Act of 1964 prohibits discrimination based on race.

94. AFSCME Local 60 was the sole and exclusive bargaining agent for various government employees, including City of Madison General Employees, which included employees of Department of Planning and Community and Economic Development (DPCED).

95. Plaintiff was a member paying dues in good standing with AFSCME Local 60.

96. According to an e-mail from Asst. Attorney General David C. Rice, Wisconsin Department of Justice (DOJ) there was no statutory requirement that a collective

bargaining agreement be adopted as a municipal ordinance. A true and accurate

copy is attached. Exh. 3, p1 ¶ 1

97. AFSCME Local 60 and defendant agreed to a collective bargaining agreement.

98. Article I subsection B was the non-discrimination clause, where the parties

agreed that their policies will not violate the rights of or discriminate against any

employees covered by the Agreement on several bases, including disability.

99. Article IX included a subsection on Job Posting and Filling. A true and accurate

copy is attached. Exh. 4, p. 1 ¶ IX(e)1 – p. 3 ¶ (e) 4.

100.        At no time did Article IX provide for the filling of a job posting by a

seniority bid process, which is a feature of bona fide seniority system. A true and

accurate copy is attached. Exh. 4 p. 1 ¶ IX(e)1 – p. 3 ¶ (e) 4.

101.        Article XVI subsection N was specific to the Americans With Disabilities

Act, specifically to exert reasonable effort to comply with requirements of the

ADA and any dispute related to the interpretation or application of the various

statutes shall be resolved in accordance with the statutory dispute resolution

procedures and will not be subject to the grievance and arbitration process of the

Agreement. A true and accurate copy is attached. Exh. 5 p. 1 ¶ n – p. 2 ¶1

102.        Article XVI subsection N, preserved the rights of employees in regard to

compliance with the ADA.

103.        2011 Wisconsin Act 10 (Act 10) eliminated collective bargaining for the

City of Madison General Employees, including Plaintiff.

104.    With the implementation of 2011 Wisconsin Act 10 the City of Madison became a unilateral employer regarding its general employees.

105.    Because Act 10 eliminated collective bargaining for general employees, Plaintiff is now a dues paying member in good standing of the successor of AFSCME Local 60 which is AFSCME Local 6000 an "employees' association."

106.    State statute <u>prohibits</u> collective bargaining by AFSCME Local 6000, an "employees' association."

<u>The chief executive officer is the Mayor.</u>

107.    As the chief executive officer, the Mayor has the responsibility and authority to manage the day-to-day operations of the cities, including the commissioning of new programs and initiatives.

108.    Federal, state and local law prohibit discrimination based on disability.

109.    Federal, state and local law prohibit discrimination based on race.

110.    Federal, state and local law prohibit discrimination based on gender.

111.    The Mayor has commissioned the creation, development, deployment and implementation of a Racial Equity and Social Justice Initiative (RESJI), including the publication of a fifteen (15) page strategy guide. A true and accurate copy is attached. Exh. 6.

112.    The terms "racial equity" and "social justice" are used to describe programs "to eliminate racial and social inequities in municipal government…throughout the city by addressing institutional racism" by

providing employment preferences based on race and or gender. A true and accurate copy is attached. Exh. 6 p.2 ¶ 1.

113.    Racial Equity & Social Justice Initiative: A Strategy Guide For City Agencies, December 2014, states "Local data show that people with disabilities...fare far worse..." A true and accurate copy is attached. Exh. 6 p. 2 ¶ "Why Racial Equity?".

114.    There are no data to support this statement in the publication.

115.    During the application process for a position in Department of Civil Rights, mayoral staff told Plaintiff "You don't have the look we want in that position."

116.    Madison Metro has changed hiring practices to address discrimination claims.

117.    The terms "racial equity" and "social justice" are used to describe programs that provide employment preferences based on race and or gender.

118.    "Racial equity" and "social justice" discriminate based on race and or gender.

08-cv-618-bbc

119.    Robert D'Angelo exhibited behaviors prohibited by APM 3-5, while working for three different Mayors, from 1991-2005 years, as determined by Judge Crabb in case 08-cv-618-bbc 672 F.Supp.2d 881 (2009). A true and correct copy of Judge Crabb's determination is attached. Exh. 7. p.1 ¶1

120.     As reported by the Wisconsin State Journal, the record established in 08-cv-618-bbc reveals after the creation of APM 3-5 the City of Madison Human Resources Director and Mayor maintained important information regarding D'Angelo in a sealed envelope "if anything should arise…" A true and correct copy is attached. Exh. 8. p. 1¶2

121.     The conspiracy of the Human Resources Director and Mayor to conceal wrongdoing resulted in a civil lawsuit and settlement.

122.     Judge Crabb wrote "I agree with plaintiff that she may recover for the older instances of harassment under the continuing violation doctrine. Under that doctrine, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 105, 122 S.Ct. 2061, 153 L.Ed.2d 106" (2002). A true and correct copy of Judge Crabb's determination is attached. Exh. 7. p.8 ¶2

## APM 3-5 Prohibited Harassment and/or Discrimination Policy

123.     In establishing Administrative Procedure Memorandums (APM's), the city, as a unilateral employer, establishes terms, conditions, privileges or rights of employment further and defines those terms, conditions, privileges or rights which are protected by law. RESTATMENT and SECOND.

124.     Including the term, condition, privilege or right of employment to accumulate sick days to the maximum allowed (with payouts for days beyond the maximum) to be used in paying for health insurance upon retirement.

125.     The APM's cover a variety of topics, including terms and conditions of employment, and are constructed with sections that provide a summary, definitions, reports and investigations, training responsibilities, and related sub-sections.

126.     APM 3-5 is related to Prohibited Harassment and/or Discrimination Policy.

127.     Resulting from the D'Angelo case, the City implemented a mandatory city-wide training program.

128.     A point of emphasis in the training was how the recipient receives the comment, behavior or other activity regardless of intent.

129.     Another point of emphasis during the training was that a passerby could overhear a comment and that would be considered a violation of APM 3-5.

130.     In June of 2014, Dickens told me "You know, you and Sarah are a real pain in the ass with your leave."

131.     The comment made to plaintiff was the equivalent of a 'receiving a slap in the face' because the injury was 'instantaneous.'

132.     Plaintiff has been in therapy for depression and anxiety since the incident.

Promise Inducing Action or Forbearance

133.    As the chief executive officer of the City, the mayor will communicate en masse to employees via e-mail.

134.    Wednesday, June 26, 2013 10:49 AM Mayor Soglin sends a message to "All Email Users." A true and correct copy is attached. Exh. 9 .

135.    Soglin states: "As you know I believe that the only way we can serve the public is by building a city government on a foundation of trust <u>where fear is eliminated from the work place…</u>" A true and correct copy is attached. Exh. 9 p.1¶1

136.    "…engage in appropriate and respectful communications with each other… We also expect every city employee to express themselves in a courteous and dignified manner in regards to their co-workers…" A true and correct copy is attached. Exh. 9 . p.1¶3

137.    Dickens comment in June of 2014 was fear inducing, inappropriate, disrespectful, discourteous and undignified as stated by the Mayor in his June 26, 2013 city wide e-mail.

138.    There was an attachment to the June 26, 2013 e-mail. That attachment includes: A true and correct copy is attached. Exh. 10.

139.    "…We are going to ensure that every one of Madison's staff, in every department, understands that they cannot effectively and properly serve the public, work with other agencies, and respect their co-workers unless every action, every word is committed with <u>trust and dignity</u>. A true and correct copy is attached. Exh. 10. p.1¶10

140.	Dickens comment in June of 2014 was discourteous, undignified and contrary to statement by the Mayor in his June 26, 2013 city wide e-mail attachment.

141.	In November of 2013 professional football player Richie Incognito was suspended for workplace harassment.

142.	On Tuesday, November 12, 2013 5:28 PM Mayor Soglin sends a message to "All Email Users" on the subject of workplace harassment, APM 3-5. A true and correct copy is attached. Exh. 11. p.1

143.	Soglin states "...I know we can all agree that a workplace culture that <u>encourages or tolerates harassment, bullying, intimidation or abusive behavior</u> would inhibit anyone from being fully involved in and passionate about the work that they perform." A true and correct copy is attached. Exh. 11. p.1¶1

144.	"They do not engage in these types of behaviors, rather, when they witness them they stand up and speak out against them." A true and correct copy is attached. Exh. 11. p.1¶2

145.	"I would like you to know that I am speaking to every employee, regardless of your daily job tasks or classification within the City." A true and correct copy is attached. Exh. 11. p.1¶3

146.	Soglin asks "Are you standing by and watching others engage in negative behaviors or are you standing up for your coworkers and for the City of Madison?" A true and correct copy is attached. Exh. 11. p.1¶3

147.     Dickens statement was harassing, bullying, retaliatory, intimidating, and abusive in violation of the promise made by the Mayor.

148.     Plaintiff had previously complained in writing about discrimination to Human Resources Director Brad Wirtz. A true and correct copy is attached. Exh. 12 p.1.¶.

149.     Wirtz failed to investigate and wrote "I'm sorry you feel this way." A true and correct copy is attached. Exh. 12.p. 1 ¶1

150.     Plaintiff reported he had complained to George Hank (in his capacity as Building Inspector Director) who disregarded a previous complaint by stating "You two are just butting heads and I'm not going to get involved." A true and correct copy is attached. Exh. 12. p.1¶7

151.     The opening paragraph of APM 3-5 states, emphasis added:

The City of Madison is committed to <u>providing equal</u> employment <u>opportunities for all</u> persons and to <u>providing a work environment free from harassment and discrimination</u>. The goal is to achieve and maintain a respectful and welcoming workplace for all members of the community. To that end, this policy will be liberally construed and strictly enforced so as to achieve these goals. Harassment, discrimination and retaliation are prohibited conduct and violations of this policy will not be tolerated. A true and correct copy is attached. Exh. 13. p.1¶1

152.     Dickens comment in June of 2014 was disrespectful and unwelcoming in violation of APM 3-5.

153.     The second paragraph states where the APM applies:

This policy also applies to conduct that occurs at the workplace and at any location that can be reasonably regarded as an extension of the workplace. A true and correct copy is attached. Exh. 13. p.1¶2

154.     Dickens prohibited animus comment was made in the Madison Municipal Building (MMB) in the lower level office of the Department of Planning and Community and Economic Development office in room 100 of the lower level, known as LL-100.

155.     Plaintiff's complained orally to Tucker and Hank as allowed in APM 3-5.

Opposing Party Admissions

156.     The Proposed Finding of Facts filed by the Defendant contains opposing party admissions.

157.     APM 3-5 section 2 on page 2: Right to File Complaint states:

"All City employees are strongly encouraged to report any violations of this policy... At their option, employees may file their complaints with any of the following: a. Their supervisor; b. Their Department/Division Head... No employee shall be discouraged from filing a complaint under this policy". A true and correct copy is attached. Exh. 13. p.2¶

158.     Defendant admits Tucker discouraged Plaintiff from filing a complaint by telling him to discuss the matter with Dickens, PFOF #78.

159.     APM 3-5 section 3 on page 2: Form of Complaint states:

Complaints may be made orally or in writing. A true and correct copy is attached. Exh. 13. p.2¶

160.     Defendant admits Plaintiff complained orally to his supervisor, Matt
Tucker, and his Department/Division Head, George Hank, PFOF #78 and 79.

161.     Defendant admits Tucker refused to accept a complaint made orally as
expressly permitted in APM 3-5. DPFOF #78

162.     Defendant admits Hank refused to accept a complaint made orally as
expressly permitted in APM 3-5. DPFOF #79

163.     Plaintiff provided a letter to Ms. Sherry Severson, Occupational
Accommodations Specialist, as part of the interactive process for reasonable
accommodation regarding disabilities and this incident is referenced as
"questionable interactions."

164.     Plaintiff filed a complaint regarding Dickens with Department of Civil
Rights.

165.     Plaintiff's progress in therapy has been impeded by having to continue to
work with Dickens.

166.     After being interviewed by Investigator Melissa Gombar, Plaintiff asked
for the sake of completeness to review the contents of the interview.

167.     Because Gombar refused Plaintiff's request, he did provide a five-page
(1736 words) brief on single incident harassment. A true and correct copy is
attached. Exh. 17.

168.     Plaintiff was never provided a written copy of the determination made by
Gombar.

169.    Gombar told Plaintiff there was no appeal of her decision that the complaint was "unreasonable."

170.    Gombar has since been promoted and transferred to another department.

171.    Defendant wrote to the Equal Rights Division (ERD) "The City is not aware that any co-employee has had "questionable interactions" with Complainant."

172.    Defendant admits Plaintiff filed a complaint with DCR. DPFOF #80.

Other APM'S

173.    APM 2-22 Workplace Accommodations was last updated January 14, 2010. A true and correct copy is attached. Exh. 18

174.    The City of Madison has an APM regarding Telecommuting. That is APM 2-34. A true and correct copy is attached. Exh. 19.

175.    APM 2-34 has a section dedicated to "Positions that are not suited to telecommuting are those that:… Require the employee to supervise others. . A true and correct copy is attached. Exh. 19.p1 ¶4

176.    Severson has told Plaintiff: "I will tell you there are a lot supervisors and managers that work from home even though they don't have a health concern."

177.    As reported former Planning Director Katherine Cornwell was "granted a great deal of leeway… including the ability to work from home as long as she continues to be available by email and for meetings." A true and accurate copy of the article is attached.  A true and correct copy is attached. Exh. 20 p.7 ¶3.

178.     APM 2-45 Disability Leave/Layoff was last updated November 3, 2010. A

true and correct copy is attached. Exh. 21 p.6 ¶ 4 (signature block.)

179.     APM 2-45 Disability Leave/Layoff, page 5, penalizes a person for using

leave, including layoff and then termination. A true and correct copy is attached.

Exh. 21 p.5

180.     The Americans with Disabilities Amendments Act, ADAA, final rules

were published by the Equal Employment Opportunities Commission on March

25, 2011 and became effective May 24, 2011

181.     September 7, 2012 in determining EEOC v. United Airlines, Inc., No. 11-

1774, the Seventh Circuit announces the <u>overruling</u> of its precedents, *EEOC v.*

*Humiston-Keeling*, 227 F.3d 1024 (7th Cir. 2000) and *Mays v. Principi*, 301 F.3d 866

(7th Cir. 2002), that held employers had no duty to place employees who were

losing their current positions due to disability into vacant positions for which

they are otherwise qualified. The court holds that this interpretation of the

ADA was superseded by the Supreme Court decision, *U.S. Airways, Inc. v.*

*Barnett*, 535 U.S. 391 (2002), and that employers have a <u>duty to transfer</u>.

182.     The Supreme Court of the United States refused the petition for high court

review of EEOC v. United Airlines, No. 11-1774. 7th Cir.

183.     As a result of the EEOC v. United Airlines, Inc., No. 11-1774, 7th Cir. any

case and any employer policies that relied on precedents, *EEOC v. Humiston-*

*Keeling*, 227 F.3d 1024 (7th Cir. 2000) and *Mays v. Principi*, 301 F.3d 866 (7th Cir.

2002) were also overruled, including *Gail King v. City of Madison*, No. 08-2052 (7th Cir. 2008)

Dickens:

184.     Dickens is known for being mean.

185.     In addition to being payroll clerk, Dickens orders the office supplies.

186.     Staff members are known to resupply while she is away from her desk.

187.     October or November 2011 Plaintiff properly and timely filed FMLA, WIFMLA, and leave paperwork for leave due to surgery.

188.     Plaintiff overhears Dickens telling Nancy Prusaitis, that "There is no reason for him (Plaintiff) to be off three weeks…"

189.     Plaintiff did explain to Dickens that based on medical history, the surgeon determined the course of action to provide the best opportunity for a complete recovery.

190.     Dickens discourages Plaintiff from exercising the terms, conditions, privileges or rights of employment by using legally mandated and discretionary benefits.

ERD Filing

191.     On April 1, 2015 I timely and properly filed a Discrimination Complaint Wisconsin Fair Employment Law with the Department of Workforce Development Equal Rights Division. A true and correct copy of the form is attached. Exh. 22.

192.     On April 15, 2015 Gregory Straub, Equal Rights Supervisor, issued a letter notifying the City of Madison of the complaint, included a copy of the complaint and instructions for responding to the complaint, including a filing deadline. A true and correct copy is attached. Exh. 23.

193.     Straub gave the City of Madison forty-five (45) days from the date of his letter to respond. A true and correct copy is attached. Exh. 23. P.1 ¶2

194.     The complaint was assigned to Equal Rights Investigator Andrew Kasper.

195.     Forty-five (45) days from April 15, 2105 was Saturday, May 30, 2015.

196.     Kasper informed Plaintiff the Defendant's response had not been filed at about 9:30 a.m., on June 9, 2015 making any response untimely.

197.     Plaintiff properly and timely brought the untimely response to the attention of Kasper. A true and correct copy is attached. Exh. 24

198.     Kasper ignored Plaintiff's legitimate complaint and accepted the untimely response.

Plain English

199.     Defendant has acknowledged being a discriminatory employer in the document "City of Madison Racial Equity & Social Justice Initiative Strategy Guide for City Agencies" published in December 2014. A true and correct copy is attached. Exh. 6.

200.     The introductory paragraph of the document specifically addresses municipal government. "RESJI aims to eliminate racial and social inequities in

municipal government...<u>by addressing institutional racism</u>" A true and correct copy is attached. Exh. 6.p2 ¶3

201.     "The three priority areas for RESJI are Equity in City Policies and Budgets, Equity in City Operations and Equity in the Community.". A true and correct copy is attached. Exh. 6.p2 ¶3

202.     The paragraph titled "Why Racial Equity?" states "Local data show..." That data was is not provided in the document.

203.     "What is equity? Equity is fair and just inclusion...including all racial and ethnic groups..." A true and correct copy is attached. Exh. 6.p4 ¶1

204.     "Where should I start?...Explore...opportunities for leadership by persons of color throughout your agency...partnerships with communities of color..." A true and correct copy is attached. Exh. 6.p4 ¶3

205.     Priority Area 1: Equity in City Operations c) engage staff..."The elimination of racism..." A true and correct copy is attached. Exh. 6.p6 ¶3

206.     Priority Area 1: Equity in City Operations e) Update hiring practices "Many people of color...experienced systemic barriers to education and pathways...traditional recruitment, hiring and advancement practices have been developed through...the dominant culture's experience..." A true and correct copy is attached. Exh. 6.p8 ¶3

207.     Refer to Item 8e - How (page 9, last bullet point): "Did the interview panel include at least one person of color and one woman? A true and correct copy is attached. Exh. 6.p9 ¶3

208.     The term discrimination has been replaced by the phrase "implicit bias" or "bias."

209.     Because the Defendant has created a training program to eliminate "implicit bias" in their workplace, Defendant has admitted that there is discrimination in their workplace.

210.     Equity in Hiring and Employee Development: A Review of Initiatives in Human Resources Designed to Increase Diversity in City Employment. In the Executive Summary item #3 Use racial equity tools — Analyze policies and practices to proactively address implicit bias and institutional racism. (Emphasis added.) A true and correct copy is attached. Exh. 25.p1 ¶3

211.     Admission that racism exists in the City and racism is discrimination.

212.     Dickens told Zoning Inspector I Sarah Anderson that Plaintiff would be difficult about losing "holiday" pay for Memorial Day (2014). A true and correct copy is attached. Exh. 26.p1 ¶2

213.     Dickens pretextual explanation, of complaining of the process, falls apart when Dickens complained to Zoning Inspector I Sarah Anderson on or about June 5th or 6th, 2014 that "it wasn't fair that Greg didn't have to use up all of his time" prior to using wage insurance. A true and correct copy is attached. Exh. 27.p1 ¶1

214.     Dickens said that "employees, should have to use up all of their own time before being able to use (wage) insurance." A true and correct copy is attached. Exh. 27.p1

215.      Page 9 of the wage insurance plan document provides the Schedule of
Insurance A true and correct copy is attached. Exh. 28.p1

216.      <u>Benefits Commence</u>: 1) for Disability caused by Injury: on the 1st day of
Total Disability after all accumulated sick leave has been exhausted; 2) for
Disability caused by Sickness: on the 8th day of Total Disability after all
accumulated sick leave has been exhausted. A true and correct copy is attached.
Exh. 28.p1 ¶ 8

217.      For hospital confinements requiring admission, or for an Outpatient
Surgical Procedure which necessitates a Total Disability period of 24 hours or
more after surgery, benefits commence: 1) on the first day of hospital
confinement; or 2) on the date of the Outpatient Surgical Procedure. A true and
correct copy is attached. Exh. 28.p1 ¶9

<u>Tangible injury of depression:</u>

218.      Plaintiff has been in treatment discussing Dickens hostilities towards
Plaintiff since the incident in June of 2014.

219.      During that time, Plaintiff has had difficulty managing the daily routine of
respiratory and physiotherapy as a cystic fibrosis patient.

220.      Plaintiff's sleep pattern has been disrupted.

221.      Plaintiff's work product has suffered.

222.      The depression makes activities of daily living, such as, focusing and
thinking about routine tasks extremely difficult.

223.     Dickens' actions that day so intimidated and debased Plaintiff, he refused to admit to the doctor that there was still pain.

224.     The EEOC only requires credible testimony from an individual about depression and Plaintiff submitted a provider letter.

225.     Plaintiff's depression and anxiety have been the subject of conversations with Sherry Severson, Occupational Accommodations Specialist.

Diagnosis: Anxiety & Depression:

226.     Plaintiff attempted to navigate the city's formulistic reasonable accommodation policy.

227.     On or about January 21, 2015 Plaintiff provided a copy of a letter from his therapist to Sherry Severson, Occupational Accommodations Specialist.

228.     The letter included the diagnoses of anxiety and depression and made recommendations for workplace accommodations. A true and correct copy is attached. Exh. 29.p1 ¶1

229.     Defendant states to the ERD that a "a vast majority of Complainant's work is inspection work out in the field, so he has even more open space than a window would allow."

230.     Defendant admits to denying a reasonable accommodation request from a provider.

231.     Despite having filed a complaint regarding Dickens with Defendant's Department of Civil Rights, Defendant writes to the ERD "The City is not aware that any co-employee has had "questionable interactions" with Complainant."

<u>Delayed Compensation:</u>

232.     During April and May 2014 Plaintiff had a short-term disability claim, related to Plaintiffs documented disabilities.

233.     Plaintiff properly and timely initiated claim with the insurer.

234.     Plaintiff properly and timely filed the necessary paperwork with the city.

235.     The initial wage insurance payment was delayed until June 12, 2014.

236.     The explanation provided by The Hartford was that they were waiting on the Defendant to properly provide information.

237.     With the conclusion of plaintiff's short-term disability claim in early June 2014, Plaintiff properly and timely submitted the required paperwork. Plaintiff's calls to The Hartford as plan administrator revealed on several occasions they (The Hartford) had to request information as the required information wasn't being provided (by Defendant) for this claim.

238.     According the Payroll Calendar, compensation for the pay period ending June 7, 2014 should have been paid on June 13, 2014.

239.     Payment was delayed until July 7, 2014.

240.     Because of my December 2014 leave, Plaintiff's compensation was delayed.

241.     A call to The Hartford revealed that the information required to pay the claim in a timely manner was not properly submitted.

242.     Causing another delay to Plaintiff's compensation due to Plaintiff's disability.

Opposing Party Admissions

243.      The explanation of the June 2014 event as presented by the city is an

admission that the process, "being a pain in the *ss", the city employs is a

violation of law. DPFOF #76

244.      The "pain in the *ss" process utilized by the city interferes with the terms,

conditions, privileges or rights of my employment to use WIFMLA and/or

FMLA and other legally mandated benefits and discretionary benefits without

suffering retaliation, coercion or intimidation for using those legally mandated

benefits and discretionary benefits.

245.      Defendant's explanation is an admission the process is in violation of the

law because the process interferes with the right and privilege of employment to

be paid in a timely manner and without suffering retaliation, coercion or

intimidation for using discretionary benefits, such as wage insurance, to be paid

in a timely manner.

Severson and "the honest truth"

246.      Severson said "I immediately react to it, if someone falls down, I start

laughing... I know, I know that's not good, but it's not a good thing and I just

can't help it" while explaining a scene she witnessed where a person fell and was

in agony complaining of "blowing" out a knee.

247.      On or about November 1, 2012, Plaintiff met with Sherry Severson

regarding an accommodation due to having cystic fibrosis.

248.      Plaintiff asked that coworkers who come to work ill be made to go home.

249.    Severson's response was no.

250.    Plaintiff asked that visitors with illnesses be asked to wear a mask.

251.    Severson's response was no.

252.    Severson told Plaintiff to wear a mask.

253.    Masks are designed to be worn by people with healthy airways and are only protection against droplets.

254.    Masks offer no protection against viruses, bacteria or molds.

255.    A respirator is a device that provides a seal that would prevent exposure to bacteria, virus, or fungus.

256.    Respirators are listed for use by persons with healthy airways.

257.    Because of the limitations of the design, testing and listing of masks and respirators their use is an ineffective modification or adjustment for Plaintiff's cystic fibrosis.

258.    September 8, 2014, Patmythes writes to Severson that "In the past we have talked about trying a HEPA filter in an effort to improve air quality in my immediate area. Let's make that happen breathing this air is having an adverse impact on my quality of life."

259.    Plaintiff satisfies the requirement of using ordinary or ordinary or plain English request and described the problems posed by the work place barrier.

260.    September 12, 2014, Patmythes met with Sherry Severson in her office.

261.     Plaintiff replied in the affirmative when Severson asked if Patmythes was ready for a HEPA filter of some sort and expressed reservation at the benefit provided by a portable HEPA filter.

262.     High Efficiency Particulate Air (HEPA) filters can be permanent (hard wired) or portable (cord connected).

263.     Portable HEPA filters come in various sizes and can handle rooms of approximately six hundred (600) square feet in area.

264.     The National Electrical Code, NEC, requires that all electrical appliances be tested, rated and listed.

265.     The NEC further requires that the electrical appliance only be used in accordance with its listing.

266.     Because using a portable HEPA filter in a room that exceeds the listing is a violation of the NEC the device is assumed to have no effect.

267.     Because a portable HEPA filter would be an ineffective modification or adjustment, this fails to meet the minimum threshold to be considered a reasonable accommodation.

268.     Severson states a person in Water Utility that "had a lot of respiratory issues…went to a different department."

269.     The City admits that Severson delayed action on a reasonable accommodation request from September 14, 2014 until November 12, 2014.

270.     On November 12, 2014 Severson frustrates Plaintiff by asking if he'd like a UV filter light.

271.     Plaintiff had already stated the problem and the relief requested in ordinary or plain English.

272.     Severson explaining there is one HEPA filter in use "So, I checked in on that filter … trying to figure out how long…"

273.     Severson also explained the HEPA filter was ineffective "she and another person it's very ineffective and more of a bigger than this one office area" (referring to her office in the Madison Municipal Building.)

274.     Severson acknowledges employees seeking accommodations are labeled as "being problem employees and rightly so…"

275.     Severson told me that "I argue too much."

276.     In discussing physical and mental health Severson offers "Well, the physical health -- I think I can help out, but mental health part of it, those things are going to happen everywhere, all agencies have that crap that goes on, <u>even HR</u> who should not be that way, that happens."

277.     Severson provided examples of city staffer's working from home or otherwise remotely.

278.     Severson stated: "I have had people from IT that are supposed to work here so they can work on stuff with people.  But because of health issues that sometimes are acute like there is -- and they have been -- we have worked something's out so, that they can stay home do some more so maybe they come in partial weeks and then have---some time at home throughout the week, so that they don't have to be exposed to things or they – sometimes they can't be at

work because of what happens with their condition. So it allows them to not have to use up all the sick time."

279.     On multiple occasions over years, Severson "I will tell you there are lot supervisors and managers that work from home even though they don't have a health concern."

280.     January 2015 providing Severson with a letter from Plaintiff's mental health provider and establishing the record of having anxiety and depression.

281.     Severson in discussing "placements" or "disability reassignments" stated "Well, and the honest truth too about -- I mean I don't want people to not have all the truth about what happens, the honest truth about when we place people in new jobs is, guess what, there's resentment and they have to deal with resentment by other people who either thought they should have gotten the job or supervisors who think 'well, how come I didn't get to select who I wanted to select."

282.     Severson then states: "So I mean there's resentments and things that people have to deal with, we try really, really hard to work on that, but like I can't go and talk to the other employees who maybe were applying for the job as well or thought they were going to get a job or an opportunity to get a job and say well, but this person has a disability."

283.     Severson simultaneously discourages Plaintiff from exercising his rights and admits there are "resentments", which is a violation of APM 3-5.

284.     Another example Severson provided that day was "I have got one person in another agency that has – she's been battling cancer – So we've arranged for her to have one day off a week and she can work from home on that one day."

285.     In discussing the possibility of relocation during the remodeling of the Madison Municipal Building, Severson asked and answered her own question "...I mean they could put us – when they moved the library out of the central into -- did you ever go in that building or? It was horrible!"

286.     The building, 126 S. Hamilton St., Severson described as "horrible" is where Plaintiff was moved to.

287.     Testing reveals there are eight varieties of mold in the "horrible" building at concentrations of 1300% found immediately outside the "horrible" building.

288.     The meeting of January 21, 2015 with Severson that ended with Plaintiff in tears.

289.      Again, in that meeting Plaintiff "checked every box." Plaintiff used ordinary or plain English to request a change to a unilateral city policy.

290.     I used ordinary or plain English to request a reassignment.

291.     I used ordinary or plain English to explain that the open office is beyond the limitations of the portable HEPA filter.

292.     Defendant proposed exhibit O, is a letter from UW Health which provides guidance.

293.     That guidance includes a need for aggressive airway clearance including vest and nebulizers and that Plaintiff's health is easily disturbed with poor air quality, temperature extremes and viral illness.

294.     Defendant has never offered Plaintiff a place to perform the recommended aggressive airway clearance.

295.     Orma Buie brought an action against her employer, the Equal Employment Opportunity Commission ("EEOC"), alleging that the agency discriminated. Buie v. Berrian. 85 F.Supp.3d 161 (2015)

296.     Buie suffers from lung disease and chronic asthma. Her condition makes her highly sensitive to air quality issues.

297.     The EEOC has a number of departments in a number of buildings and numerous cities.

298.     Because no private offices were available in the department, the EEOC continued to look for a vacant office in other departments.

299.     The court determined that a private office in other departments or in other buildings was a reasonable accommodation.

300.     The City of Madison has a number of departments which are housed in a number of buildings.

301.     Severson has told Plaintiff that the City of Madison has established a routine practice of allowing employees to work in areas that are beyond the physical space occupied by the employee's department.

302.    The City of Madison admits it failed to undertake the effort of checking different facilities.

303.    An accommodation has to alleviate the conditions and provide the same terms, conditions, privileges and rights of employment.

304.    For example: The city offered to place a HEPA filter in my cube.

305.    The HEPA filter is neither tested nor listed for use in an office environment as large of an area as occupied by the Department of Planning and Community and Economic Development in the lower level of the unhealthy Madison Municipal Building.

306.    In Buie v. Berrien, the plaintiff was assigned to an open-air cubicle, where her air purifier was ineffective because of the large space.

307.    Requiring Plaintiff to walk into the unhealthy building to get to an isolated work area isn't an accommodation.

308.    As Plaintiff is exposed to unhealthy air, which irritates the sinuses and lungs.

309.    The Defendant continues to require Plaintiff to work with the person responsible for Plaintiff's depression and anxiety.

310.    Plaintiff has been denied the right to work in other physical locations that has been granted to other city employees, regardless of disability.

311.    Defendant failed to articulate an undue hardship for the denial related to the January 10, 2015 letter from Plaintiff's mental health provider.

312.    Plaintiff's provider gave specifics on accommodating Plaintiff's health.

Defendants "Bona Fide" Seniority System Is Discriminatory Pretext

313.    The Employee Handbook defines seniority as "Seniority" is a measure of an employee's time on the City payroll including time off for compensable periods of absence from duty such as vacation and sick leave and reduced by time on leave of absence without pay, time on layoff status, and time spent working at less than 1.0 FTE. A true and correct copy is attached Exh 30 p.1 ¶4

314.    Plaintiff has been penalized, including loss of "seniority", for work missed during times of unpaid leave to care for his disabilities and serious medical conditions.

315.    Levying a penalty for work missed during leave is a denial of reasonable accommodation.

316.    A bona fide seniority system, such as United Airlines, provides for employees on Extended Illness Status (EIS) to continue accumulating seniority for a maximum of six years. A true and correct copy is attached Exh. 31 p1,2 ¶Art. 7.B.2. Adjustments to Seniority Dates.

317.    The City of Madison "seniority system" contains no provision for either bidding on open or vacant positions or bidding on open or vacant positions for transfer.

318.    A bona fide seniority system, like the one at United Airlines, provides for the filling of positions, whether promotion or transfer, using a bid system based on the bona fide seniority system. Exh. 31 p1 ¶A.4.

"Best Candidate At The Time" More Pretext:

319.    The Defendant claims to use a competitive system that "claims" to hire "the best candidate during the interview", without exception, as being the person that did best in the panel interview as the sole criterion for selection.

320.    George Hank, a decision maker, in his capacity as Building Inspection Unit Director explained to Plaintiff the panel interview process as "the panel makes a decision that hopefully I agree with."

321.    Hank has since shifted his explanation by saying "As the total package when we make the hire, they are the best candidate at the time. Without a doubt."

322.    Hank told staff that this first choice for the Housing Inspection Supervisor position didn't accept the job.

323.    As a person with a disability, Plaintiff asked if any consideration was given to an internal candidate's body of work?

324.    Hank's response was "no."

The Hoffman Privilege Paradox:

325.    In 2007 the City of Madison posted a vacancy for the position of Facilities and Sustainability Manager.

326.    Larry Nelson was the City Engineer for the Defendant at the time.

327.    In advertising the position, the Defendant asked for someone with an engineering or architecture degree, or other relevant "training and/or experience."

328.     Hoffman has a business administration degree from the UW-Stout, with an emphasis on marketing.

329.     Plaintiff on the other hand have never received the privilege of having neither his professional nor educational accomplishments viewed in such a favorable light during the hiring and/or competitive promotional processes with the defendent.

330.     Plaintiff specifically asking to be treated in the same manner as Hoffman.

331.     Defendant admits to basing the employment decision on more than the interview process, which is contrary to the "best candidate" defense.

The Hoffman Privilege Paradox Postscript:

332.     2015 the Engineering Department had a posting for a Project Manager, Plaintiff properly and timely applied.

333.     Believing the interview was part of the reasonable accommodations process Plaintiff mentioned that during the interview.

334.     The posting was withdrawn after the interviews.

335.     The position was recreated at a lower level.

336.     The decision to end the recruitment and recreate the position was delivered after the filing of Plaintiff's April 1, 2015 complaint.

337.     Jeanne Hoffman was head of the interview panel.

The System Already Contains Exceptions

338.     Roger Goodwin was the "Interim Director of Human Resources" for three (3) years. A true and correct copy is attached. Exh. 32.p1 ¶1 & 4

339.     Goodwin holding the position of Interim Director of Human Resources three (3) years belies the assertion that "interim" is temporary.

340.     Withdrawal and recreation of the posting are contrary to precedent.

341.     Witzel-Behl was hired as Clerk when the posting stated "Clerk/Treasurer."

342.     Ragland to head up the Office of Community Services, had no experience in early childhood development and/or non-profit contract administration.

343.     Placing the Parks Department under the leadership of the IT Manager

344.     Police Chief Koval was promoted from sergeant to chief, skipping the ranks of lieutenant and captain.

345.     The privilege of "under filling" or being named "interim" have been denied to Plaintiff.

346.     Other non-disabled candidates received treatment more favorable than Plaintiff.

347.     In the ordinary course of business Plaintiff's requests are based on practices established by the defendant and are therefore not undue hardships.

348.     Plaintiff's requests for modified policies, based on established practices in the workplace are always met with "no."

Health Insurance: The City Speaks:

349.     Madison General Ordinance 3.13(5) empowers the Director of Human Resources or designee to represent the Cities interests to employee associations.

350.     Greg Leifer is that designee.

351.     Greg Leifer, Employee and Labor Relations Manager, made the following statements

352.     "...having a clear correlation of people understanding the costs and then using that resource more wisely..."

353.     "...fifteen percent of covered lives use eight-five percent of your premium dollars that 15%, sorry but that 15% is getting protection from the other 85% that have good genes and don't get sick..."

354.     "...greatest good for the greatest number of people..."

355.     "...I don't want to make this sound as Darwinian as it's going to sound but to follow up..."

356.     "...on great genes versus bad genes. Doesn't the bad genes person have a responsibility to maintain their health?"

357.     "To avoid the things that are going to make their chronic conditions worse?"

358.     During the investigation at the ERD the Defendant denied that Leifer made comments regarding "bad genes."

359.     Doug Ley, Willis of Wisconsin, stating the "old and infirm cost the most money" was probative in 04-C-0367C (7th Cir 05-3074). . A true and correct copy is attached. Exh. 33.p1 ¶4

360.     Leifer's comments are noteworthy because Plaintiff has had multiple pulmonary exacerbations during the time period January 2014 through April 2015.

361.    That frequency represents an increase of exacerbations.

362.    The defendant is undertaking a renovation of the Madison Municipal Building (MMB) to re-establish the building as "healthy."

363.    The City acknowledges the building is "unhealthy" and Plaintiff is trying to comply with Leifer's directive to "avoid the things that are going to make my chronic condition worse" but attempts to secure my terms, conditions, privileges or rights of employment to healthy work environment by being reassigned are denied.

364.    As Leifer is suggesting, Plaintiff is trying to avoid the unhealthy MMB because the MMB makes Plaintiff's health worse.

365.    Plaintiff has been attempting to navigate the reasonable accommodations process to no avail.

366.    Because Plaintiff fears for his health and his job on March 20, 2015 Plaintiff hired attorney Paul Kinne to navigate the Defendant's Workplace Accommodations policy to secure reassignment to preserve his health and his job.

367.    Greg Leifer stated "(Defendant) has no obligation to deal with an attorney."

368.    Remember, clever men discriminate in clever ways.

## The City Denies "Interactive Process"

369.    In order to deny being involved in an interactive process the City admits to knowing what an interactive process is.

370.    When an individual decides to request accommodation, the individual or his/her representative must let the employer know that s/he needs an adjustment or change at work for a reason related to a medical condition.

371.    Plaintiff has met that standard.

## A Discrimination Double Dose:

372.    Prior to the filing of my complaint the hiring process for Equal Opportunities Investigator/Conciliator 1 was conducted.

373.    During the application process I was told "You don't have the look we want in that position."

374.    Plaintiff was told that the deciding factor in the selection process was the fact that the person who was selected based upon her body of work in the department as an administrative support staff person.

375.    Contradicting the Defendant's assertion that the interview is the sole basis for hiring.

## Hiring Privilege:

376.    CEO 3 - Building Inspectors are hired at that rank, with or without credentials and/or inspection experience at the time of hire.

377.    After the passing of Bill Korsgard (Code Enforcement Officer III - Construction Inspection) George Stulgaitis (Code Enforcement Officer III - Minimum Housing Inspector) was transferred to the vacancy.

378.    Having the requisite credentials and experience in construction inspection Plaintiff asked about transferring to the position held by the late Korsgard.

379.      Hank replied "no."

380.      Pursuant to the retirement of George Stulgaitis, Plaintiff asked George

Hank about transferring.

381.      Hank's response was to laugh and say "Go ahead and apply you won't get

it. I don't want another Stulgaitis."

382.      The CEO 3 – Building Inspectors enforce a statewide code.

383.      Zoning Code Officers enforce codes unique to the community that

employs them.

Interview Panels:

384.      The proffered procedure for interviews is the panel asks the same

questions of all of the candidates to ensure a uniform process.

385.      During the interview for a Code Enforcement Officer 3 - Building

Inspector position, the panel asked Plaintiff about the cubic volumes of buildings

Plaintiff had inspected.

386.      A poll of another internal candidate, revealed that other candidate hadn't

been asked that question.

387.      Three minutes into Plaintiff's interview for Housing Inspection Supervisor

one of the panel members, Al Schumacher, commented on my 40th birthday.

388.      During my interview for the Police Records Supervisor, which I properly

identified myself as an applicant with a disability,

389.      The Police Records Supervisor panel refused to answer some of my

questions.

Unripe Exhibits S & T – An Analysis

390.     The letter known as Exhibit S was written by Patricia Lauten an attorney

employed by the City of Madison and has yet to ripen for consideration by this

court.

391.     The letter known as Exhibit T has yet to ripen for consideration by this

court.

392.     If Exhibits S and T were ripe, the analysis would reveal "these shifting

explanations to be sufficiently inconsistent or otherwise suspect, to create a

reasonable inference that they do not reflect the real reason."

393.     The doctrine of *contra proferentem* applies and favors the non-drafting

party, in this case the Plaintiff in Exhibits S and T.

394.     On page 2 of Exhibit S in the section labeled "Assignment is Temporary",

Lauten writes "If there is no available work, this temporary assignment will

end."

395.     Lauten specifies only one item to end the temporary assignment.

396.     Exhibit T contains an admission that the temporary assignment is ending

due to something other than the specifications authored by Attorney Lauten.

397.     Defendant admits the temporary assignment was ended due to other

allegations.

398.     This On page 2 in the section labeled "Assignment is Temporary" Lauten

writes further "…Severson will work with Mr. Patmythes and his Department to

identify reasonable accommodations…"

399.      Lauten makes no mention of requiring Plaintiff's medical team to participate in the reasonable accommodation process.

400.      This shifting explanation of the process Plaintiff was to follow infers pretext.

401.      Exhibit R – p1 ¶1. The 3 hours per day were intended to be incrementally, not a contiguous block of time as required by Defendant.

402.      Exhibit S - p1¶5, Effective Date. Patmythes was prepared and ready at the specified time on the specified date and no work arrived.

403.      Exhibit S. – p1¶6, Assigned Work "Any work that requires Mr. Patmythes to obtain information from <u>sources housed in the Department or elsewhere in the City</u> or that requires Mr. Patmythes to be in the field will <u>not be assigned</u>."

404.      The allegations contained in Exhibit T ¶3, which explicitly states "approval from Planning Unit staff" was required.

405.      Exhibit T contains an admission that the temporary assignment is ending due to allegations of "significant fundamental errors."

406.      Exhibit T focuses on the word 'reasonable' where the law focuses on the word 'accommodation.'

407.      Exhibit T goes on to hold the unreasonable standard of "error free".

408.      Exhibit T alleges "You approved a house plan where the foundation/floor plan did not match the submitted site plan."

409.      An allegation so vague as to be impossible to respond to.

410.     Exhibit T alleges Plaintiff made an error on a permit for a home at 9601
Tiercel Dr. having a "special conditions" flag and "zoning is responsible for
catching and connecting to Planning for clearance. "You approved the permit
and advanced it to issuance without <u>obtaining approval</u> from the Planning Unit
staff."

411.     According to the city records the address, 9601 Tiercel Dr., doesn't exist. .
A true and correct copy is attached. Exh. 35.p1

412.     Exhibit T admits that work was assigned to Plaintiff that is prohibited by
Exhibit S. – p1¶6, Assigned Work "Any work that requires Mr. Patmythes to
obtain information from <u>sources housed in the Department or elsewhere in the
City</u> or that requires Mr. Patmythes to be in the field will <u>not be assigned</u>."

413.     Plaintiff was penalized for an error on a no-existent address for work that
was assigned in violation of the terms of Exhibit S.

414.     An unripe Exhibit T charges that a mistake was made on a phone call, that
Defendant expressly states "should have been routed to the Asst. Zoning
Administrator, Zoning Administrator or planning staff."

415.     This holds Plaintiff responsible for the phone message being forwarded to
him, which was beyond his control, and is another acknowledged violation of
Exhibit S.

416.     Plaintiff sent an e-mail with the link to the procedure to the caller. A true
and correct copy is attached. Exh. 36.p1 ¶1

417.     The unripe Exhibit T states that "discord" was caused with an alder over a
proposed project at 2096 Helena St.

418.     The alder for that address is Marsha Rummel.

419.     In a conversation with Rummel regarding the alleged "discord", Alder
Rummel stated that she doesn't remember this project.

420.     Alder Rummel's failure to remember any "discord" discredits this
allegation.

421.     Defendant omits the mistakes Plaintiff did catch.

422.     The defendant has regulations regarding signage or street graphics.

423.     There is process, known as a Comprehensive Design Review (CDR),
which allows for signage that ordinarily not allowed by the code to be approved
at a public hearing by the Urban Design Commission.

424.     A CDR is prescriptive in nature and spells out precisely what is permitted.

425.     For instance, Dianna McMaster, Badger State Designs, told Plaintiff she
appeared in person at the zoning counter and spoke with Chrissy Thiele, Zoning
Inspector I, regarding erecting a sign at the Villager Mall on S. Park St.

426.     Plaintiff spoke with Dianna about the requirement that signs can only be
externally illuminated per the text of the approved Comprehensive Design
Review (CDR) for this property.

427.     Dianna stated she looked at the file with Chrissy and wasn't told of this
requirement.

428.     The requirement is explicitly stated in the text of the document and illustrated in the drawings attached to the file.

429.     Dianna had designed an internally illuminated sign which her client liked the design of and authorized Dianna to pursue obtaining a permit.

430.     After learning of Thiele's mistake, Dianna had to redesign the sign and have her client approve of the changes.

431.     Thiele also overlooked the fact that temporary signage wasn't specifically approved. Dianna also applied for a Business Opening Sign for her client.

432.     An amendment to the CDR needs to be submitted and approved for temporary signage.

433.     Dickens approved "regular" hours and the accompanying electronic deposits were made on January 8, 2016.

434.     Plaintiff promptly notified Payroll via telephone and the reversals were initiated.

435.     Plaintiff believes initial contact was with Kathy Hambre and she turned the matter over to a colleague.

436.     Plaintiff was informed that had he not been honest and reported the matter the error would have never been found.

437.     Katrina Barger, also made some mistakes in Accela. Plaintiff had to exert the effort to remedy those errors, including advancing work flows.

438.     Ryan Signs, Bridget Growney, was notified that a project was assigned to Plaintiff when in fact it hadn't been assigned to Plaintiff.

439.     Marla Rauls, who was tasked with being the courier of work assignments, temporarily lost a sign permit in her vehicle. A true and correct copy is attached. Exh. 37.p1 ¶

Reasonable accommodations in the workplace.

440.     April 1, 2015 is the date the plaintiff filed a complaint with the State of Wisconsin Department of Workforce Development Equal Rights Division (ERD), which was cross-filed with the United States Equal Employment Opportunities Commission (EEOC) and was designated as ERD Case No. 201500823/EEOC Case No. 26G201500669C. A true and correct copy is attached. Exh. 22.p1

441.     December 4, 2015 ERD Equal Rights Officer Andrew Kasper wrote a letter, requiring additional information for the July 20, 2015 filing, which Kasper states he provided to Defendant. Kasper required several revisions and accepted the amended complaint January 19, 2016. A true and correct copy is attached. Exh. 50.p1

442.     Because there are issues of material fact, the ERD's dismissal is improper.

443.     The matter before this court is the appeal of the dismissal.

444.     Any issue occurring after April 1, 2015 is unripe for this court because April 1, 2105 is the date of the original complaint.

445.     There is no such e-mail on January 6, 2014 and no such e-mail is provided with Sherry Severson's Affidavit, 1/18/218.

446.     This claim is vague and ambiguous it has neither merit nor basis.

447.     The "work-at-home" assignment began on January 4, 2016.

448.     Patmythes verbally using plain English, which according to the EEOC is permissible, passed along recommendations to Severson

449.     The recruitment for the Investigator/Conciliator I position was opened and closed in 2014.

450.     Lipski is testifying to an item which he lacks firsthand knowledge of. Defendant wrote to the ERD the panel was "Colier McNair...Charlyn Cruz-Nunez...and Lucia Nunez".

451.     Lipski is testifying to an item which he lacks firsthand knowledge of. Defendant wrote to the ERD the panel members were "Sue Fichel, Jena Kujak and Carl Gloede".

452.     The time sheet submitted by Patmythes was properly coded because Dickens procedure is to ask for corrections and no corrections were asked for.

453.     Because in ordinary English the statement would have been "you know this process is a real pain in the ass. But for disabilities, Plaintiff would have been on ordinary payroll. Dickens statement was a negative comment about Plaintiff's disability.

454.     Tucker lacks the firsthand knowledge to make this statement.

455.     Hank told Plaintiff that he (Hank) wouldn't get involved and Dickens should do her f*cking job.

456.     Leifer lacks the firsthand knowledge to testify to this.

457.      Severson told Plaintiff that she had created a training for payroll clerks.

458.     Access to city programs including, the benefit of the hiring process for

"red flagged positions", the Racial Equity and Social Justice Initiative, the

Women's Leadership Conference have been denied.

459.     Leifer's statement of denial is speculation and conflicts with the June 12,

2015 e-mail from Erin Stenson, Organizational Health and Development

Manager. A true and correct copy is attached. Exh. 51.p1

460.     City organizational charts, including Building Inspection, available

through the City Human Resources webpage show positions as being "under

filled." A true and correct copy, emphasis added, of the 2012 org chart is

attached. Exh. 52.p1

461.     A copy of the Permanent Salary Detail (PSD), emphasis added, from the

2012 Building Inspection is attached as Exh 53.

462.     Budget documents and organizational charts for Building Inspection show

that Code Enforcement Officers 1 and 2 are noted as "underfilled" on the

organizational chart and "budgeted" as Code Enforcement Officer 3. Compared

to Zoning Code Officer 1 and 2 which are separate on the organizational chart

and Permanent Salary Detail.

463.     According to The Equitable Workforce Plan, the "Trainee Designation is

given by the HR Director to underline designate applicants with potential, but who may

not necessarily meet the outlined training and experience requirements for a

position and create a trainee position in order to assist in meeting diversity

goals." A true and correct copy, emphasis added, of the 2012 org chart is attached. Exh. 54.p1

464.     None of Plaintiff's reasonable accommodation requests resulted in the citation of an "undue hardship" as required by law.

Subscribed and sworn to before me

This _8_ day of March, 2018.

_Laura Brennan_

Print Name: _Laura Brennan_

Notary Public, State of Wisconsin

My commission: _09.28.2018_

**Notary Public
State of Wisconsin
Laura Brennan**