IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

GREGORY PATMYTHES,

                           Plaintiff,                    OPINION AND ORDER

        v.
                                                         16-cv-738-wmc
CITY OF MADISON,

                           Defendant.

*Pro se* plaintiff Gregory Patmythes suffers from cystic fibrosis, a life threatening disease requiring extensive medical care. While he remains an employee of defendant, the City of Madison ("the City"), Patmythes brings this action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and § 504 of the Rehabilitation Act of 1973 ("the Rehabilitation Act"), as amended, 29 U.S.C. § 794, claiming that the City: (1) discriminated against him on the basis of his disability by "deliberately and intentionally eliminating only his position of employment" and refusing to transfer him to a different position for which he was qualified; (2) failed to provide reasonable accommodations to enable him to manage his cystic fibrosis symptoms better; and (3) subjected him to a hostile work environment because of his disability.

Pending before the court is the City's motion for summary judgment (dkt. #9), as well as Patmythes' motion for assistance in recruiting counsel (dkt. #7) and motion to exclude certain evidence (dkt. #27). For reasons explained in this opinion, the court will deny Patmythes' request for assistance in recruiting counsel while granting his motion to exclude in part and denying it in part. Because the evidence of record, even when viewed

in Patmythes' favor, does not support a finding that the City violated his rights under the ADA or Rehabilitation Act, the court will also grant the City's motion for summary judgment.

OPINION

## I.  PATMYTHES' MOTIONS

### A.  Motion for assistance in recruiting counsel (dkt. #7)

Patmythes requests that the court recruit counsel on his behalf because he has recently been diagnosed with a type of arthritis associated with his cystic fibrosis, and he suffers from infections attributed to his condition, as well as anxiety and depression. Patmythes also represents that he has reached out to multiple law firms, each of whom have declined.  Unfortunately, the starting point for any request for appointment of counsel in civil cases is that there is no such right.  *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014).  Rather, courts may grant motions for assistance in *recruiting* counsel where a party meets several requirements.  *Santiago v. Walls*, 599 F.3d 749, 760-61 (7th Cir. 2010).  Here, Patmythes has established that (1) he is unable to afford counsel and (2) he has made reasonable efforts to find a lawyer on his own but has been unsuccessful.

Still, plaintiff's motion turns on his ability to represent himself.  The operative question is not whether a lawyer will do a better job than Patmythes -- that is almost always the case.  Instead, the question is whether this is a case in which it appears from the record that the legal and factual difficulties exceed the plaintiff's ability to prosecute it on his own. *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007).  In responding to the motion for

summary judgment, Patmythes submitted his own lengthy affidavit, along with numerous documents related to his employment and statements by other City employees. While the admissibility of some of these filings is questionable, he has demonstrated an awareness of the issues relevant to his claims and the ability to gather substantial evidence to support his claims. Furthermore, his briefs are clearly written and, while acknowledging that his arguments at times rely on facts that do not bear directly on his claim in this lawsuit, Patmythes explains that he wanted to provide additional information for context. Substantively, Patmythes cites to relevant authorities and argues his position under the proper standard. More generally, Patmythes has been engaged in this lawsuit: he meets deadlines and apprises the court when he is unavailable. Accordingly, while the court does not underestimate how difficult handling this lawsuit may be for Patmythes, he has done a more than adequate job representing himself through summary judgment, and so his motion will be denied.

## B. Motion to exclude certain evidence (dkt. #27)

Patmythes moves to exclude certain evidence that the City submitted in support of its motion for summary judgment. In particular, he seeks to exclude: (1) the City's documentary evidence because the citations to the exhibits lack a page and paragraph designation; and (2) several of defendant's proposed findings of fact ("DPFOF") and documents concern events occurring after April 1, 2015. Patmythes' first request will be denied. The City's citations to certain of the exhibits generally did not require a page and

paragraph number. In particular, the court has reviewed the City's citations and corresponding evidence, finding the proposed fact support by the materials as cited.[1]

As to his latter request, Patmythes states that the facts and documents related to events after April 1, 2015, should be excluded because that was the date he filed his complaint with the State of Wisconsin Equal Rights Division ("ERD"), and the United States Equal Employment Opportunities Commission ("EEOC"). *See* ERD Case No. 201500823/EEOC Case No. 26G201500669C ("Case '669"). He specifically asks the court to exclude or limit the DPFOF ¶¶ 7, 8, 25- 29, 31- 34, 36- 39, and 64-66. The City agrees that materials beyond Case '669 are not properly before the court, but explains that Patmythes' complaint and filings in this case have included information not directly related to Case '669, which is why its proposed findings of fact include a broader range of facts. Therefore, the City agrees to the proposed exclusion of some of its findings, but not others, requiring the court to address them in turn.

*First*, the City points out that even though his claim in this lawsuit relates to Case '669, paragraphs 57-71 of his complaint contain allegations related to Patmythes' *ongoing* ERC/EEOC complaint. *See* ERD Case No. CR201503529/EEOC Case No. 26G201600445C ("Case '445"). In Case '445, Patmythes alleged that between April 15 and December 16, 2015, his reasonable accommodation requests were repeatedly denied. In particular, Patmythes alleges that: (1) a women's leadership program discriminated

---

[1] Nor has Patmythes alleged that he had difficulty identifying the City's cited materials, and his responses suggest the opposite. Patmythes responded specifically to the City's proposed findings of fact in his affidavit, citing to multiple paragraphs of the City's proposed findings of fact. (Patmythes Aff. (dkt. #26) ¶¶ 161-62, 172, 243.)

against him on the basis of disability and gender; (2) the City did not respond to his July 23, 2015, submission from his cystic fibrosis care team related to reasonable accommodations; and (3) the City had not complied with his request to work up to three hours per day from home. (Def.'s Ex. D (dkt. #12-3) at 5-7.) The ERD issued a "no probable cause" decision regarding Patmythes' disability allegations and a "probable cause" decision with respect to his sole allegation based on gender. While Patmythes appealed the "no probable cause" findings related to the disability allegations, and those findings were certified for a probable cause hearing, Patmythes subsequently requested they be held in abeyance due to ongoing health issues. Accordingly, the EEOC has not issued a determination with respect to the allegations Patmythes set forth in Case '445, and the court considers them here only as helpful in context.

*Second*, the City agrees that several of its proposed findings of fact should be excluded, but asks that some to which Patmythes objects be considered nevertheless because they relate to Case '669 and not Case '445. Specifically, the City takes the position that if the court agrees it lacks jurisdiction to address issues beyond the purview of Case '669, DPFOF ¶¶ 25-27 and 29-38 should be excluded because they relate to *other* accommodation requests not encapsulated in Case '669. Even more specifically, the parties seem to agree that: ¶¶ 25-27, 29-31, and ¶¶ 36-38 all relate to Patmythes' leave of absence; and ¶¶ 32-35 relate to his request that he be allowed to work at home. Patmythes agrees, replying that he does not want this court to resolve any issues that the Administrative Law Judge ("ALJ") currently handling his ERD appeal could resolve.

*Third*, the City nevertheless asks that the court deem DPFOF ¶¶ 7-8 relevant to this lawsuit because those paragraphs merely outline Case '445, which informs what issues are properly before the ALJ. The court agrees and will not exclude those paragraphs from consideration. Additionally, the City explains why DPFOF ¶¶ 28, 39, and 64-66 should be considered, pointing out that Patmythes amended Case '669 on January 20, 2016, to include multiple accommodation allegations. (Def's Ex. B (dkt. #12-2).) Therefore, the City asserts that this court has jurisdiction over the accommodation-related issues to which DPFOF ¶¶ 28, 39, and 64-66 refer.

Indeed, paragraph 28 describes a June 23, 2015, letter the City received from Patmythes' health care provider related to his health care needs; paragraph 38 outlines the timeframe of Patmythes' use of leave; and paragraphs 64-66 describe how the City handled a job posting.

Each of these facts are relevant, or at least provide context, to Patmythes' claims that are properly before the court. Accordingly, the court agrees that this lawsuit should be limited to the claims Patmythes raised in Case '669, and it will not consider DPFOF ¶¶ 25-27 and 29-38 (as well as corresponding Exhibits Q, R, S, T, U and V) for purposes of summary judgment, and will only reference these facts as needed for context.

## II. CITY'S MOTION FOR SUMMARY JUDGMENT (dkt. #9)

### UNDISPUTED FACTS

Consistent with Patmythes' position in his motion to exclude, the City also objects to a large number of Patmythes' proposed findings of fact as irrelevant to the claims properly before the court in this lawsuit, because they pertain to issues beyond Case '669. As Patmythes has not opposed the objection, and indeed explicitly stated that he would prefer to have his appeal of the issues in Case '445 handled by the ALJ, the court summarizes those facts as needed for context only. Regardless, the following facts are deemed undisputed for purposes of the City's motion for summary judgment when viewed in a light most favorable to plaintiff. *Helmen v. Duhaime*, 742 F.3d 760, 761 (7th Cir. 2014).

### A. Background

The City's Department of Planning, Community and Economic Development ("Department") includes a Building Inspection Division, which in turn includes the Zoning Administration where Patmythes worked. During the relevant time period, George Hand supervised the Building Inspection Division, and Matthew Tucker supervised the Zoning Administration. At that same time, the City had in place the following Administrative Policy Memorandums ("APM"): APM 3-5 - "Prohibited Harassment and/or Discrimination Policy"; APM 2-22 - "Workplace Accommodations"; and APR 2-45 - "Disability Leave/Layoff". The City also employs an Occupational Accommodations Specialist to assist employees with disabilities.

Patmythes began working for the City in May of 2004 as a Zoning Code Officer I, and he was promoted to a Zoning Code Officer II in 2006 by virtue of the City's practice of "underfilling" positions. That is, Patmythes was hired to fill a position actually budgeted at Code II. Although Patmythes was initially hired at Code I, he rose to this higher level through his subsequent promotion.

Since Patmythes' employment began, the City has been well aware of his cystic fibrosis. While not directly relevant to Case '669, Patmythes took leave for multiple periods of time between April of 2015 and April of 2016, returning to his Zoning Inspector position on April 22, 2016, beginning with a part-time schedule. In June 2016, he began working as a Zoning Inspector on a full time basis, and he continues to work in that capacity.

### B. Patmythes' requests for accommodations

City Occupational Accommodations Specialist Sherry Severson worked with Patmythes on his disability and accommodations requests. On September 8, 2014, Patmythes wrote to Severson requesting a HEPA ("High Efficiency Particulate Air") filter to improve air quality in his work area, which he claimed was having an adverse impact on his quality of life.[2] Severson responded that she would contact him the next day to talk specifics.

On September 12, 2014, Patmythes met with Severson in her office, who expressed doubts that a portable HEPA filter would appreciably improve his office's air quality.

---

[2] HEPA filters can be permanent or corded, and portable filters can operate in rooms of approximately six hundred square feet.

When Severson asked if he was ready for a HEPA filter, Patmythes replied in the affirmative. As an alternative, Severson asked Patmythes whether he would consider moving to a different room. Either way, Severson explained that Patmythes would need to provide documentation of his medical needs to address his condition. Finally, Severson talked about another individual with respiratory issues who transferred to another department, but according to Severson that individual did not move departments as a result of an accommodation. (Severson 2d Aff. (dkt. #41) ¶ 6.)

On November 12, 2014, Severson emailed Patmythes, attaching three links to air quality control devices and asking him whether a Ultraviolet Germicidal Irradiation ("UVGI") device would be a better alternative. Additionally, Severson again asked Patmythes' opinion about moving to an empty office if one was available. Having not received a response by November 21, 2014, Severson emailed Patmythes once again, asking him if he would agree to an office switch. According to Patmythes, after this email exchange Severson and Patmythes had a conversation in which Severson stated that she had checked on a HEPA filter and learned that there was one in use by two other employees, but it had proven ineffective. According to Patmythes, it was during this exchange that Severson said he "argued too much." (Patmythes Aff. (dkt. #26) ¶ 275.)[3]

On December 5, 2014, Patmythes emailed Severson, stating that she should expect two requests from his doctors: (1) getting him a healthier work environment; and (2) modifying his schedule because he had been having a "pulmonary exacerbation." Severson

---

[3] It appears that they also discussed how other employees work remotely, but this issue is relevant to Case 445.

responded on December 8, 2014, acknowledging Patmythes' note and letting him know that they could start the conversation with Matt and George (the supervisors) sooner.

On January 6, 2015, however, Severson emailed Patmythes that she had still not received medical documentation regarding needed accommodations. Patmythes responded the next day, stating that his therapist was against relocating him to a different room, but that he had been certified for a position in the City's Civil Rights Department and wanted to discuss a transfer to that position. Severson responded that to transfer him on the basis of a disability, the City would first need to determine that there were no reasonable accommodations available to him in his current position. On January 8, 2016, Severson emailed Patmythes to acknowledge their many conversations about his conditions and possible accommodations, but further writing that even though she thought he was ready to provide documentation, Patmythes seemed "reluctant to move forward" when they reached the point of approaching his supervisor. (Ex. 1 to Severson 2d Aff. (dkt. #41).)

On January 10, 2015, Severson received a letter from Patmythes' therapist, Nina Pernecke. (Pl.'s Ex. 29 (dkt. #26-26.) In that letter, Pernecke confirmed that Patmythes was under her care for depression and anxiety related to his cystic fibrosis. She recommended "his work space include a window and that the proximity of such space avails him to workplace interaction." (*Id.*) On January 16, 2015, Patmythes also submitted a formal "Request for Accommodation" to Severson for a transfer to a vacant position. (Def.'s Ex. P (dkt. #13-11).) Patmythes stated that his current assignment was exacerbating his conditions and requested a transfer to the Engineering Department of the

Department of Civil Rights. (*Id.*) Patmythes further advised Severson to let him know if she needed any further documentation about his condition.

On January 21, 2015, Severson met with Patmythes in person, and he brought along a copy of Pernecke's letter. By that point, Patmythes had rejected the option of moving to a different room with a window. Severson and Patmythes discussed the fact that the City would be moving his entire department to temporary offices in a different building due to a remodel, and Severson warned that the temporary offices were "terrible." According to Severson, she was referring to the large number of displaced City employees at that space, but Patmythes understood Severson to mean that the temporary office had terrible environmental conditions. According to Patmythes, Severson made additional comments suggesting that she did not want him reassigned because of his disability:

- "I don't want people to not have all the truth about what happens, the honest truth about when we place people in new jobs is, guess what, there's resentment and they have to deal with resentment by other people who either thought they should have gotten the job or supervisors who think 'well, how come I didn't get to select who I wanted to select.'"

- "So I mean there's resentments and things that people have to deal with, we try really, really hard to work on that, but like I can't go and talk to the other employees who maybe were applying for the job as well or thought they were going to get a job or an opportunity to get a job and say well, but this person has a disability."

According to Patmythes, he left this meeting in tears. (Patmythes Aff. (dkt. #26) ¶ 288.)

Next, Patmythes claims the City's Employee and Labor Relations Manager, Gregory Leifer, made comments on January 28, 2015, about health insurance coverage, which Patmythes interpreted as discriminatory toward individuals with disabilities. The context is unclear -- but Patmythes avers that Leifer made the following statements:

- "[F]ifteen percent of covered lives use eight[y]-five percent of your premium dollars that 15%, sorry but that 15% is getting protection from the other 85% that have good genes and don't get sick."

- "I don't want to make this sound as Darwinian as it's going to sound but to follow up … on great genes versus bad genes. Doesn't the bad genes person have a responsibility to maintain their health? To avoid the things that are going to make their chronic conditions worse?"

(Patmythes Aff. (dkt. #26) ¶¶ 353-57.) At least for purposes of summary judgment, the City does not dispute these statements were made, but argues that they are not material to this lawsuit.

On February 4, 2015, Patmythes emailed Severson, asking for a status update on his requested reassignment. (Def.'s Ex. Q (dkt. #13-12) at 2.) Severson was out of the office that day and did not respond. On February 23, 2015, Patmythes followed up with a longer email about his request, stating that since Severson and he had met on January 21, he submitted his reassignment request and the City Engineering Department had contacted him for an interview. Patmythes believed that contact was part of the reasonable accommodation reassignment process, but learned during the actual interview that it was not. Patmythes further stated that he met the minimum qualification requirements for a number of job postings, and he requested that "the hiring processes be held in abeyance while we explore the reasonable accommodation of reassigning me to one of those positions." (*Id.*)

Also on February 23, Severson responded to Patmythes' email, apologizing for her delay but explaining that she had difficulty finding time to speak to Brad Wirtz and the City Attorney regarding the modification of the City's policy on using reassignment as a

reasonable accommodation. (APM 2-22.) She further attached the City's memorandum responding to his reassignment request, and added:

> I cannot understand why you would have believed that your interview with Engineering was part of an accommodation process. First of all, as I have indicated on numerous occasions, we have not fully explored the potential for accommodations in your current position. Secondly, I had no knowledge of your involvement in that particular hiring process.

(*Id.* at 1.) In the memorandum, dated February 19, Severson also stated that the City was denying his request.

In particular, Severson cited APM 2-22, which had been modified over time but consistently required the City to reassign "an employee who, because of a disability, can no longer perform the essential functions of his/her current position, with or without reasonable accommodation, unless the employer can show that it would be an undue hardship." (*Id.* at 4.) Severson further explained that:

> In your situation, we have not yet attempted to put accommodations in place for your current position although we have discussed possibilities on many occasions. It is at this point when you have retracted from the process. Up until recently[,] you provided no medical documentation that would support the things that we had discussed as possible accommodations, and the note that you provided most recently puts one of your conditions at odds with another in coming up with a possible accommodation.
>
> I would very much like to continue exploring, and hopefully putting into place, some form of accommodation in your current position that would allow you to work more comfortably. I still believe that some level of telecommuting might be an option worth considering although we have yet to have a dialogue with your supervisors regarding any form of accommodation.

(*Id.* at 5.) Patmythes responded later that day, citing to "*EEOC v. United*," which he believed supported his reassignment request. He also stated that the timing of his interview

indicated that it was part of his reassignment request, and that he was very disappointed by her statement that he retracted from the process.[4]

On March 15, 2016, Severson emailed Patmythes (and other employees) asking whether there were any accommodation needs in the temporary offices. It does not appear that Patmythes responded. At some point afterwards, Patmythes was moved to the temporary space located at 126 S. Hamilton Street, the place that Severson had described as "terrible." According to the City, he worked on the first floor area in a large open floor plan that had large windows and thus a good amount of natural light. While he does not provide details about his work environment on Hamilton Street, Patmythes claims that he was still denied a healthy work environment, prompting him to hire an attorney on March 20, 2015.

In late July of 2015, the City finally received documentation from a medical provider related to Patmythes request for an accommodation in the form of a letter, dated July 23, 2015, from Brook LaChance, a nurse practitioner with UW Health's Cystic Fibrosis Center in Madison, Wisconsin. (Def.'s Ex. O (dkt. #13-10).) In that letter, LaChance confirmed that Patmythes' cystic fibrosis included the following issues: chronic cough that produces thick mucus, pulmonary lung infections 2-3 times a year, sinus congestion with frequent infections, chest congestion and shortness of breath. LaChance stated that the recommendations for Patmythes were to "manage his ongoing symptoms with aggressive airway clearance including vest and nebulizers, daily exercise, taking oral

---

[4] Patmythes added that he had communicated his needs using plain English, which he believed was permissible. (Def.'s Ex. Q (dkt. #13-12) at 1.)

medications as prescribed." LaChance added that "his health is easily disturbed with poor air quality, temperature extremes and viral illnesses," and she concluded the letter by requesting that the City "continue to work with Greg and his attorney on reasonable accommodations to continue his employment." (*Id.*)[5]

### C. Patmythes' applications to other positions and evidence of underfilling, temporary and interim hirings

In addition to the position discussed above, Patmythes applied for several vacant positions, though again outside the accommodation process. Rather, those positions were filled through the City's Civil Service Process. First, at the end of 2014, a vacancy arose in the Department of Civil Rights ("OCR") for an Equal Opportunities Investigator/Conciliator 1 position. The recruiting period for that position ran between October 9 and October 26, 2014. Patmythes and four other City employees applied and each were interviewed. The interviews were scheduled for January 9, 2015. Three City supervisors sat on the interview panel, which asked each interviewee the same four questions, and gave each the opportunity to provide the panel with information they deemed relevant. After the interview, each panel member independently scored the interviewee's answers. During the application process, Patmythes reports being told that he did not "have the look we want in that position," but he does not identify who made the statement or the specific context in which the comment was made. (Patmythes Aff

---

[5] LaChance did not include any specific recommendations with respect to whether Patmythes should be working during his "aggressive airway clearance" regimes, although his health care providers had indicated that he should not be working during those periods of time when Patmythes previously requested FMLA leave.

(dkt. #26) ¶ 372.)[6]  Regardless, Patmythes scored the lowest of all five applicants, and the highest scoring applicant was hired.  Patmythes was notified on February 2, 2015, that he was not selected.  At that time, he was told that the person hired had prior work experience as an administrative support staff person.

Second, in January of 2015, Patmythes applied for a position entitled "Project Manager."  That posting was initially listed for architects only, but then the City's Human Resources department broadened the minimum qualifications to include someone with a construction management background.  Patmythes was initially screened out, but he successfully appealed for consideration, citing to his industrial education degree and related experience.  The City ultimately received ten qualified applicants for the position, and all ten were referred for an interview.  Following the interviews, however, the Supervisor concluded that none of the ten applicants met her needs because the job required more architectural experience than any of the candidates possessed.  Accordingly, the City re-posted the vacancy in May of 2015 as an "Architect 2/3" position.  Patmythes did not apply for that position.

Third, in February of 2015, a Police Records Supervisor position opened up.  Nine applicants, including Patmythes, were interviewed, and the applicant who scored significantly higher than all of the other applicants was hired.  Patmythes was not.

Patmythes also asserts that other, non-disabled employees received the benefit of the City's practice of "underfilling" positions or hiring "interim" employees, offering

---

[6]  The City does not dispute this statement for purposes of summary judgment only.

examples of instances where individuals were hired on a temporary basis or were "underfilled." First, Roger Goodwin was hired as the "Interim Director of Human Resources" for three years. Second, Witzel-Behl was hired as a Clerk, even though the position was posted as "Clerk/Treasurer." Third, Ragland was hired to lead the Office of Community Services with no experience in the area. Fourth, Police Chief Koval was promoted to chief directly from sergeant. However, Patmythes does not provide evidence of the circumstances surrounding any of these hires, including the process undertaken to fill the positions.[7]

### D. Allegations of hostile work environment

As the administrative clerk for Patmythes' Department in charge of coordinating benefits, Kris Dickens provided information to the City's HR Department to obtain coverage through the City's disability insurance carrier for Patmythes' time off. Part of this process involved entering Patmythes' time off using proper coding, which required Dickens to go back and forth with HR. On June 5, 2014, after Dickens had several exchanges with HR, she became frustrated and said to Patmythes "You know, you and [another employee] are a real pain in the ass with your leave." (Patmythes Aff. (dkt. #26) ¶ 130.) Patmythes claims Dickens complained to another Zoning Inspector that: (1) Patmythes was difficult about losing holiday pay for Memorial Day; (2) "it wasn't fair that Greg didn't have to use up all of his time"; and (3) "employees should have to use up all of their own time before being able to use (wage) insurance." (*Id.* at ¶¶ 213-15.)

---

[7] Again, the City does not dispute the alleged facts for purposes of summary judgment, instead taking the position that they are not material.

Patmythes reported this exchange to his supervisors, Tucker and Hank. Tucker suggested that Patmythes speak to Dickens about it if he wanted. According to the City, Hank suggested that Patmythes should put his complaint in writing and Hank would deal with it, while Patmythes claims that Hank responded that he would not get involved and that Dickens should "do her fucking job." (*Id.* at ¶ 455.) Apparently understanding how her comments might be perceived, Dickens drafted an email to herself that described what happened and characterized the exchange as expressing frustration with the repeated back and forth with HR, not with Patmythes' disability.

Afterwards, Patmythes filed a complaint against Dickens under the City's discrimination policy, APM 3-5. After investigating, the City concluded that Dickens' comment was not directed at Patmythes' disability and did not create a hostile work environment.[8] Patmythes states that the incident had an adverse impact on his mental health, and that having to work with Dickens subsequently impeded his therapy.

### E. Patmythes' ERD/EEOC cases

#### i. Case '669

As previously described, Patmythes filed Case '669 on April 1, 2015. Patmythes amended that complaint on January 20, 2016. His complaint includes the following timeline:

- June 5, 2014: comment by Dickens, and the subsequent handling by Hank and Tucker.

---

[8] Patmythes alleges one other instance regarding Dickens' behavior. In October or November 2011, Patmythes overheard Dickens tell another employee, "There is no reason for him to be off three weeks." More generally, Patmythes claims that Dickens is known for being difficult to work with. It does not appear this information was provided to or considered by the City.

- December 5, 2014: Patmythes submitted a request for reasonable accommodation to Severson.

- January 9, 2015: City filled the Investigator/Conciliator position without considering Patmythes. During the application process, Patmythes is informed he "doesn't have the look" the City wants, which Patmythes describes as discrimination based on disability, gender and race.

- January 21, 2015: Patmythes submitted a request for reasonable accommodation to Severson, and Severson discouraged him from asking for a transfer because there may be hard feelings from other employees that also want the position.

- January 28, 2015: Leifer told Patmythes that people with "bad genes" have a duty to avoid things that made their chronic conditions worse because it causes health insurance premiums to increase.

- February 20, 2015: Patmythes interviewed for Project Manager position and mentioned his belief that it was part of the reasonable accommodation process.

- February 25, 2015: Patmythes submitted a request for accommodation with Severson.

- March 6, 2015: Project Manager recruitment terminated by the City, to be reclassified at a lower pay grade, contrary to the City's practice of "underfilling" positions.

- March 11, 2015: Patmythes interviewed for positions in Human Resources and he was discriminated against because his accommodation requests had not been met.

- March 27, 2015: The City admitted that the hiring process is in need of reform because of systemic racism at Madison Metro.

- March 31, 2015: Patmythes interviewed for Police Records supervisor, but the panel refused to answer Patmythes' questions during his interview.

- April 1, 2015: Patmythes filed ERD and EEOC complaints.

(Def.'s Exs. A, B (dkt. ##12-1, 12-2).)

On April 13, 2016, the ERD issued a "no probable cause" decision that dismissed

Case '669. Patmythes did not appeal the ERD's dismissal. On August 10, 2016, the EEOC

issued a "Dismissal and Notice of Rights" form that adopted the ERD's findings and notified Patmythes that he had 90 days to file a federal lawsuit with respect to the allegations in Case 669. (Def.'s Ex. C (dkt. #12-2).)

### ii. Case '445

On January 22, 2016, Patmythes filed a second complaint with the ERD and EEOC. In Case '445, Patmythes alleged that between April 15, and December 16 of 2015, his reasonable accommodation requests were repeatedly denied. (Def.'s Ex. D (dkt. #12-3) at 5-7.) As noted above, this case has not been resolved because Patmythes is in the process of appealing his reasonable accommodation claims. Patmythes filed this lawsuit on November 9, 2016. In paragraphs 14-56, Patmythes outlined the claims that he brought in Case '669. In paragraphs 13 and 57-71 of his complaint, Patmythes outlines the allegations that he brought in Case '445.

## SUMMARY JUDGMENT OPINION

The City agrees that Patmythes has a disability and that he is a "qualified individual" for purposes of the ADA and Rehabilitation Act, but seeks summary judgment on Patmythes' claims on four grounds: (1) the court lacks jurisdiction to consider plaintiff's allegations related to Case '445; (2) no reasonable trier of fact could find that the City discriminated against plaintiff based on his disability; (3) no reasonable trier of fact could find that the City failed to provide him with a reasonable accommodation for his condition; and (4) no reasonable trier of fact could find that the City created a hostile work environment based on plaintiff's July 2014 incident with Dickens. As to the first of

these arguments, this court plainly lacks jurisdiction to consider plaintiff's allegations related to his second ERD/EEOC complaint, referred to above as Case '445. Patmythes does not oppose this argument specifically; rather, he seeks to have the ALJ, and not this court, resolve his appeal in that case. Accordingly, the court will not exercise jurisdiction over Patmythes' allegations in paragraphs 57-71 of his complaint, focusing instead on whether a reasonable trier of fact could conclude on the record before the court on summary judgment that the City discriminated against Patmythes on the basis of his disability, failed to provide him with a reasonable accommodation, or subjected him to a hostile work environment.[9]

### A. Discrimination

The ADA prohibits employers from discriminating against a qualified individual on the basis of a disability. 42 U.S.C. § 12112(a). Historically, to prevail on a discrimination claim against the City under the ADA, a plaintiff can proceed under the direct or indirect method of proof. *See Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 489 (7th Cir. 2014). More recently, however, the Seventh has moved away from a rigid application of "the many multifactored tests in employment discrimination cases" and, instead, directed district courts to "decide, when considering the evidence as a whole, 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge.'" *Monroe v. Ind.*

---

[9] In the employment context, the ADA's standard applies to Rehabilitation Act claims as well. *Brumfield v. City of Chi.*, 735 F.3d 619, 630 (7th Cir. 2013).

*Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017) (quoting *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). Because the parties have organized their arguments consistent with the two methods, the court will as well, while mindful that the ultimate question is simply whether plaintiff has presented sufficient evidence from which a reasonable fact finder could conclude that defendant discriminated against him because of his disability.

Under the direct method, he must show that (1) he is disabled within the meaning of the ADA, (2) he was qualified to perform the essential functions of the job, with or without accommodation, and (3) he suffered an adverse employment action because of his disability. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014). To establish the third prong, plaintiff must show that his disability was a "but for" cause of the adverse employment action. *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961-62 (7th Cir. 2010). Plaintiff can show causation through direct or circumstantial evidence, with circumstantial evidence encompassing, among other things, suspicious timing and pretext for the adverse employment action. *Bunn*, 753 F.3d at 684.

Under the indirect method, plaintiff must establish a *prima facie* case of discrimination by showing that (1) he is disabled under the ADA, (2) he was meeting his employer's legitimate employment expectations, (3) he suffered an adverse employment action, and (4) similarly-situated employees without a disability were treated more favorably. *Id* at 685. If plaintiff establishes a *prima facie* case, the burden shifts to the City to present evidence showing a legitimate, nondiscriminatory reason for the employment action. *Id.* If the City meets its burden, then Patmythes must submit evidence that the

City's stated reason is pretextual.  *Id.*  Patmythes does not explicitly pursue either method of proof, but on this record, he cannot avoid judgment under either.

As an initial matter, Patmythes has offered *no* evidence that he was qualified for any of the three positions, nor that he was even arguably the most qualified.  Instead, he suggests that the qualifications are irrelevant because of the City's policy of underfilling positions.  Even assuming that plaintiff were qualified for one of the positions, Patmythes has no evidence that he was turned down for that position *because of* his disability.  Instead, he appears to rely on circumstantial evidence in the form of statements made by Severson, Leifer and Dickens related to his disability.  As set forth above, the court will assume for purposes of summary judgment that:  in January of 2015, Severson told him that other employees would resent him if he were reassigned because of a disability; around the same time, Leifer arguably implied that Patmythes and other who require insurance benefits had "bad genes," and thus had an obligation to keep himself healthy; and in June of 2014, Dickens told him that handling his leave benefits coordination was a "pain in the ass."

However, none of this evidence would support a finding of discriminatory animus in the City's hiring decisions.  Indeed, Leifer's and Dickens' statements are non-starters because *neither* were involved in the decision not to hire Patmythes for any of the positions to which he applied.  *See Fleischman v. Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012) ("[A] nondecisionmaker's animus is not evidence that the employer's actions were on account of plaintiff's age.").  As to Severson's statement, she arguably *could* have placed Patmythes in one of the three positions sought, and her statements about other employees or supervisors resenting him, made contemporaneous to her decision not to reassign him,

could fairly be interpreted to be *some* circumstantial evidence that her decision was tainted. Nonetheless, Patmythes himself broke any causal connection between Severson's apparent reluctance to place him in a vacant position because of his disability and the decision not to reassign him. While Severson *repeatedly* told Patmythes that he would need to provide documentation to support his request for reassignment, he never actually followed up, even after Severson asked for the information on multiple occasions. Accordingly, Patmythes' discrimination claim fails.

Nor can Patmythes avoid judgment under the indirect method. Patmythes can easily meet the first three elements: he is disabled, the record supports a finding that he was meeting expectations, and a cognizable adverse employment action under the ADA is a significant change in employment status, which includes hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *See Chaudhry v. Nucor-Steel-Ind.*, 546 F.3d 832, 836 (7th Cir. 2008) (citing *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000)).

The fourth prong is an insurmountable hurdle for Patmythes because he has not submitted evidence that there were other, non-disabled employees who were treated more favorably. To satisfy this element, plaintiff would need to "identify a satisfactory comparator to the court." *Bunn*, 753 F.3d at 685 (7th Cir. 2014). "The inquiry is fact intensive, requiring consideration of the circumstances as a whole." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610-11 (7th Cir. 2006) (citing *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000)). Here, Patmythes claims that the City discriminated against him on the basis of his disability in failing to hire him for the

Investigator/Conciliator, Project Manager, and Police Records Supervisor positions. (*Id.* at ¶¶ 36-39, 45-49, 54.)[10] To support his theory that other, non-disabled employees were treated more favorably, however, Patmythes describes instances in which other non-disabled City employees were hired on an "interim" or temporary basis, or through the City's process of "underfilling." In particular, he points to the interim hiring of Goodwin, the underfilling hiring of Witzel-Behl and Ragland, and the promotion of Koval to chief of police, to suggest that the City failed to apply its typical hiring practices to him because of his disability. Yet these examples are not proper comparators because plaintiff provides no context for those hiring decisions. Not only are the positions facially distinct, but plaintiff offers no evidence as to how the City carried out the hiring and interview process to fill these other positions, much less evidence that these other individuals were more or less qualified than other candidates. Therefore, it would be unreasonable to conclude that Patmythes was "similarly situated" to these other individuals. Considering all of this evidence, the court concludes that a reasonable fact finder could not conclude that defendant was denied another position within the City because of his disability.

---

[10] The City also asserts a statute of limitations defense with respect to Patmythes' challenge to his Investigator/Conciliator position hiring process. To challenge that decision, plaintiff had to bring a claim with an administrative agency within 300 days of the event giving rise to the discriminatory act. 42 U.S.C. § 12117; 42 U.S.C. § 2000e-5(e)(1). The City points out that Patmythes received notice that he was not going to be hired for this position on February 2, 2015, and failed to include this claim in his initial April 1, 2015, ERD/EEOC complaint. Instead, he added it to his January 20, 2016, amended complaint. However, a plaintiff may amend an EEOC charge "to clarify and amplify allegations made therein," not to allege an entirely new theory that does not relate back to a timely filed original charge. *Fairchild v. Forma Sci., Inc.*, 147 F.3d 567, 575 (7th Cir. 1998) (citing 29 C.F.R. § 1601.12(b)). In Patmythes' original ERC/EEOC charge, he complained about "promotions" that he did not receive. Accordingly, when he amended his complaint in January of 2016, he was arguably only providing greater detail with respect to each of his failed attempts to apply for a new position, including the Investigator/Conciliator position, meaning that amendment relates back to the April 2015 original filing date.

Even assuming that plaintiff's examples somehow got him over the *prima facie* threshold, the City has provided undisputed evidence that it had a legitimate reason for each hiring decision: the hiring processes involved a panel of interviewers who asked each interviewee the same set of questions; the panel members scored each interviewee independently; and the individual that was hired was the highest scoring interviewee. More specifically, as to the Investigator/Conciliator position, the person hired had previous work experience in that City agency, and Patmythes received the lowest score among all of the applicants. Similarly, the City decided to change the requirements of the Project Manager position to include broader architectural qualifications, and so it had to restart the hiring process with new criteria as to *all* applicants, not just Patmythes. As a result, *Patmythes* chose not to apply for the revised posting. Finally, the City submitted undisputed evidence that Patmythes was not chosen for the Police Records Supervisor position because there was another applicant who scored significantly higher than all of the other applicants *and* had previously supervisory experience in that area. Neither was true of Patmythes. Accordingly, even assuming that Patmythes could show that he was treated differently than similarly situated, non-disabled employees, a reasonable trier of fact would have to find that the City had legitimate reasons for making the hiring decisions in each instance.

At least with respect to the Project Manager position, Patmythes also contends that the justifications are pretextual. However, "to show pretext, a plaintiff must show that (1) the employer's non-discriminatory reason was dishonest and (2) the employer's true reason was based on discriminatory intent." *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010) (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008)). Here,

Patmythes claims that during the application process, "someone" from the Mayor's office told him that he does not have the right "look" for the position. However, he does not provide any additional detail about who said it or the context in which this comment was made, including whether the comment actually referred to his disability in some way. Otherwise, his conclusion as to the import of this observation is based on speculation alone, which is insufficient to create a factual dispute as to why the highest scoring candidate was hired. *See Hooper v. Proctor Health Care, Inc.*, 804 F.3d 846, 854 (7th Cir. 2015) ("With only Hooper's speculation, we cannot find sufficient evidence to create a question of fact as to whether Proctor's proffered reason for Hooper's termination was pretextual.") (citing *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002)); *see also Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014) (holding that employee failed to show pretext where he only offered speculation instead of identifying inconsistencies in employer's reasons for termination). Even more important for purposes of summary judgment, Patmythes offers no evidence that the person who said this to him had *any* involvement in the hiring process for the position. Accordingly, no reasonable fact finder could conclude that the City's reasons for denying him these positions were pretext for discrimination because of his disability.

### B. Reasonable Accommodation

Under the ADA and Rehabilitation Act, a "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B); 29 C.F.R. pt. 1630, App. § 1630.2(o); *see also EEOC v. Sears, Roebuck*

& *Co.*, 417 F.3d 789, 805 (7th Cir. 2005). To prevail on a failure to accommodate claim, plaintiff must show that he was a qualified individual with a disability, and that defendant was aware of his disability but failed to reasonably accommodate it. *Bunn*, 753 F.3d at 682. Once a covered employer becomes aware of an employee's disability, it must engage in "an 'interactive process' to determine the appropriate accommodation under the circumstances." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998). Even if a plaintiff can show that his disability has not been reasonably accommodated, the employer "will be liable only if it bears responsibility for the breakdown of the interactive process." *Sears*, 417 F.3d at 805. In such circumstances, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).

Here, Patmythes challenges as unreasonable the City's failure to provide him with a healthy work environment by (1) providing him a HEPA filter, (2) moving him to a workspace with a window and a chance for workplace interaction, *or* (3) transferring him to another position. The City insists that this claim fails because it reasonably accommodated plaintiff's disability and, even if it did not, plaintiff was indisputably responsible for the breakdown of the interactive process.

### i. HEPA filter or different workspace with better air quality

The City cannot be held liable for Severson's failure to provide Patmythes with a HEPA filter. For one, an employer is not required to provide the particular accommodation that an employee requests or prefers, but rather to provide a *reasonable* accommodation. *Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012). Patmythes does not dispute that

Severson discussed his requests for a HEPA filter with him between September 2014 and January 2015, nor that Severson suggested that Patmythes could consider moving to another office space. Severson did not rule out the option of a HEPA filter, and instead she asked him for medical documentation to confirm his needs. While Patmythes assured her that he would be providing it, he never did.

In the meantime, the undisputed records shows that Severson explained her reservations as to whether a HEPA filter would be effective and offered Patmythes other options, including using UVGI cleaners or moving to a different office. Yet Patmythes rejected both options without explaining (to Severson or the court) why either would have been inadequate. Eventually, in January of 2015, Severson expressed frustration that Patmythes had not provided the medical documentation requested, and she repeated her requests. When she finally received a letter from Patmythes' mental health care provider, there was *no* recommendation about the HEPA filter, and the record shows Severson attempted to follow the actual recommendation to provide Patmythes with workplace interaction and natural light. While Patmythes would make much of Severson's statement in January that the temporary workspace was "terrible," he does not dispute that when actually moved to the temporary workspace, he was allowed to sit in an open area with plenty of natural light. Given the undisputed evidence that Severson was never provided with medical guidance on the claimed need for a HEPA filter *and* that Severson was communicating with Patmythes in an effort to gather the necessary information to accommodate his requests for a workspace with better air quality, while providing what she could, a reasonable trier of fact would have to find that Patmythes' own failure to provide

requested information precluded Severson from pinpointing the exact nature of his needs, much less how best to accommodate them. *See Tadder v. Bd. of Regents of Univ. of Wis. Sys.*, 15 F. Supp. 3d 868, 888 (W.D. Wis. 2014) (finding that employer did not fail to provide reasonable accommodation where employee failed to provide information from medical providers related to his requested accommodation).

Similarly, to the extent Patmythes is complaining about the delay between his first request for accommodation in September of 2014 and January of 2015 when he first requested reassignment, that argument is also unavailing. An employer may be held liable for unnecessary delays in complying with reasonable accommodation requests, but courts reach that conclusion only where the record supports a finding that the employer has not been acting in good faith. *See Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000) (concluding that despite 20-month delay in reassigning employee, employer was acting in good faith because it reconsidered reassignment on a weekly basis, kept employee on medical leave and offered the position as soon as it became available); *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996) ("A party that obstructs or delays the interactive process is not acting in good faith."). The record does not support a finding that Severson was acting in bad faith here because Severson was waiting for medical information. *See Clayborne v. Potter*, 448 F. Supp. 2d 185, 192 (D.D.C. 2006) (holding that 12-month delay reasonable in light of defendant's efforts, including seeking additional medical information).

Here, Patmythes again takes issue with Severson not immediately providing him with the HEPA filter, but the evidence shows that *Patmythes* himself was the bottleneck to

progress. He repeatedly ensured Severson that his care providers would forward the medical information needed to address his concerns about air quality, and when finally provided, the information did not even address his supposed need for a HEPA filter. Instead, Severson received a simple note from Patmythes' nurse practitioner that he be allowed to work near a window and engage with other co-workers. Even the June 2015 letter from Patmythes' cystic fibrosis care team provided no specific recommendations as to the need for air filters. Instead, that team simply requested that the City continuing working with Patmythes. In other words, despite Severson's repeated efforts to obtain it, Patmythes failed to provide information necessary to craft a more reasonable accommodation to improve his working environment.

### ii. Vacant position

While the Court of Appeals for the Seventh Circuit recognizes reassignment as a reasonable accommodation, it is appropriate *only* after the employer has determined that the employee cannot be accommodated in his or her current position. *King v. City of Madison*, 550 F.3d 598, 600 (7th Cir. 2008) ("King is correct to note that the ADA recognizes reassignment to a vacant position as a potentially reasonable accommodation if a disabled employee is unable to perform the essential functions of a job. 42 U.S.C. § 12111(9)(B)."); *Dalton v. Subaru-Isuzu Auto.*, 141 F.3d 667, 678 (7th Cir. 1998) ("The option of reassignment is particularly important when the employee is unable to perform the essential functions of his or her current job, either with or without accommodation or when accommodation would post an undue hardship for the employer."). Here, the City's reassignment policy, APM2-22, contains this same principle, providing for reassignment

upon a determination that "the employee cannot be reasonably accommodated in their current position."

While Patmythes claims that he should have been reassigned to one of three vacancies, the City was never able to conclude that he could not be reasonably accommodated in his Zoning Inspector position. Patmythes does not deny that Severson was attempting to collect his medical provider's recommendations regarding how best to accommodate his particular needs. Certainly, the City was aware that Patmythes was having difficulties with the air quality in his workspace at the end of 2014 and early 2015, and Severson was attempting to work with Patmythes to determine specific steps the City could realistically take to alleviate those issues. At least as of the date that Patmythes submitted Case '669, however, the City could not make that determination because Patmythes had not provided specific information from his doctors. Therefore, judgment in the City's favor is appropriate because the record does not support a finding that it failed to accommodate plaintiff's request, even construing all the facts in Patmythes' favor.

### C. Hostile Work Environment

Finally, the City seeks judgment on Patmythes' claim that he was subjected to a hostile work environment. While the Court of Appeals for the Seventh Circuit has not decided whether a hostile work environment claim is actionable under the ADA or Rehabilitation Act, its analysis of such claims suggests it may be. *See Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 603 (7th Cir. 2009) (the incidents described failed to meet the standard of a hostile work environment claim). Regardless, if the cause of action exists, it appears analogous to Title VII hostile work environment claims, and so the court will analyze this

claim under that framework. *See Silk v. City of Chi.*, 194 F.3d 788, 804 (7th Cir. 1999) (analyzing ADA hostile work environment claim, without deciding whether such a claim exists, under the Title VII framework).

To succeed on a hostile work environment claim, plaintiff must show that: (1) his work environment was both objectively and subjectively offensive; (2) the harassment was based on his disability; and (3) the conduct was sufficiently severe or pervasive so as to alter the conditions of his employment. *See Boss v. Castro,* 816 F.3d 910, 920 (7th Cir. 2016); *Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 978 (7th Cir. 2009). "An objectively hostile environment is one that a reasonable person would find hostile or abusive." *Adusumilli v. City of Chi.*, 164 F.3d 353, 361 (7th Cir. 1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Courts must consider the totality of circumstancing in evaluating whether a workplace is hostile, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23.

At least for purposes of summary judgment, the City does not dispute that Patmythes felt subjectively offended by Dickens' and Leifer's comments, and the court will accept Patmythes' representation that Dickens' comments negatively impacted his improvement in therapy. While the comments Patmythes dealt with may have been inappropriate, however, the circumstances simply do not describe the type of environment that qualifies as objectively offensive under the factors set forth by the Supreme Court in *Harris*. *See Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) ("Not every

unpleasant workplace is a hostile environment.").

As an initial matter, Patmythes does *not* claim a pattern of inappropriate conduct. Instead, there are two, separate narratives he points to as creating a hostile work environment: (1) Dickens' statements from June 2014 that his leave requests were a "pain in the ass," as well as Dickens' contemporaneous complaints to his coworker; and (2) Leifer's January 2015 comments implying that Patmythes and others who may be ill have "bad genes." In response, Patmythes correctly points out that a single incident *can* give rise to an actionable hostile work environment claim if "sufficiently severe." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600-01 (7th Cir. 2014). However, none of the statements, whether standing alone or considered together, is sufficiently offensive to support a finding that he endured a hostile work environment.

Specifically, Dickens' June 2014 statement is not sufficiently severe to support a finding that he dealt with a hostile environment. *See Ellis v. CCA of Tennessee, LLC*, 650 F.3d 640, 648 (7th Cir. 2011) (finding stray comments that included the word "monkey," and two incidents of an employee wearing clothing marked with a confederate flag were insufficient to maintain a race-based hostile work environment claim); *but see Cerros v. Steel Tech., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) (recognizing that an "unambiguously racial epithet falls on the 'more severe' end of the spectrum"). Certainly, Dickens' June 2014 comment was rude, but there is no evidence that she made it in a threatening way towards Patmythes, or even that she raised her voice or was physically threatening. Moreover, calling Patmythes' leave requests a pain in the ass -- even assuming it is because of his disability -- is far from severe. Likewise, even though Patmythes may have overheard

other comments that Dickens made about one of his medical leaves shortly after that incident, the Seventh Circuit's treatment of harassment claims strongly suggests verbal harassment was limited to a handful of overheard statements, rather than any intentionally inflicted, which simply does not rise to the severe or pervasive standard. *See Patt v. Family Health Sys.*, 280 F.3d 749, 754 (7th Cir. 2002) (eight gender-based comments over a three-year period too isolated and sporadic to constitute a hostile work environment); *Ngeunjuntr v. Metro Lift Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998) (isolated incidents outside of employee's presence did not create a hostile work environment**).**

The same is true as to Leifer's claimed comment. While the context of the statement is unclear, it can be fairly characterized as unseemly and insensitive. However, Leifer's apparent opinion about how Patmythes should handle his health care is not so objectively offensive to create a hostile environment. Indeed, the facts here are readily distinguishable from other isolated acts held to be severe enough to constitute actionable harassment. *See EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422 433 (7th Cir. 2012) (supervisor severely harassed an employee when he stated he wanted to "fuck her," she was "kinky" and liked "rough sex," and physically groped her buttocks); *Smith v. Sheahan*, 189 F.3d 529, 534 (7th Cir. 1999) (single incident of injuring employee's wrist due to her gender constituted severe harassment); *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008) (allegation of rape sufficiently severe to create a hostile environment).

The same conclusion is necessary when viewing Patmythes experiences with Dickens and Leifer as a whole. The comments -- made over the course of six months by two different people -- were not severe and did not pervade his work experience. While

Patmythes claims that Dickens is known for being difficult to work with, there is no evidence that Patmythes dealt with either Dickens or Leifer on a regular basis, much less that they made any other comments arguably implicating his cystic fibrosis. Additionally, the evidence of record does not suggest that Patmythes' work performance was adversely affected. While his progress in therapy may have been hampered by Dickens' lack of sensitivity, there is no evidence or suggestion that Patmythes was unable to work as a result of those comments.

More importantly, the City cannot be held liable for this incident because it took prompt steps to correct Dickens after her comment and Patmythes never even reported Leifer's comments, despite knowing he should. Employers are "strictly liable" for harassment inflicted by supervisors, but when the harasser is a co-worker, the employer can assert an affirmative defense by showing that it: (1) "exercised reasonable care to prevent and correct promptly any sexually harassing behavior"; and (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities that the employer provides. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (employer may escape liability if it took reasonable care to prevent and promptly correct the offending behavior); *Silk*, 194 F.3d at 805 (same). Here, the record shows that Patmythes reported the incident with Dickens to his supervisor Hank, and then he submitted an internal complaint about it pursuant to the City's policy, APM 3-5. As to Leifer, Patmythes' failure to take advantage of the policy by reporting Leifer -- when he clearly knew about the policy -- absolves the City from liability. Accordingly, as a reasonable trier of fact could not find that Patmythes was subjected to a hostile work

environment on the evidence of record, summary judgment will be granted in the City's favor.

ORDER

IT IS ORDERED that:

1) Plaintiff Gregory Patmythes' motion for assistance in recruiting counsel (dkt. #7) and motion to exclude certain evidence (dkt. #27) are DENIED.

2) Defendants' motion for summary judgment (dkt. #9) is GRANTED as follows: (a) the claims outlined in Patmythes' allegations in paragraphs 57-71 of his complaint are DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction; and (b) the remaining claims are DISMISSED WITH PREJUDICE.

3) The clerk of court is directed to enter judgment in defendant's favor and close this case.

Entered this 13th day of June, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge